RACHELE R. BYRD (190634)
byrd@whafh.com
BRITTANY N. DEJONG (258766)
dejong@whafh.com
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:   619/234-4599

*Attorneys for Plaintiff*

[Additional counsel appear on signature page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT C. HARTMANN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>   v.<br><br>VERB TECHNOLOGY COMPANY, INC., and RORY J. CUTAIA,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Scott C. Hartmann ("Plaintiff"), individually and on behalf of all other persons similarly situated, by the undersigned attorneys, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, announcements made by defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Verb Technology Company, Inc. ("Verb" or the "Company"), and information readily available on the Internet. Plaintiff believes that substantial evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons or entities who purchased or otherwise acquired Verb common stock between January 3, 2018 and May 2, 2018, both days inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

## JURISDICTION & VENUE

2.     The federal law claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC.

3.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as well as Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render

the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District, and Verb's U.S. offices are located within this District.

6. In connection with the acts, conduct, and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

**PARTIES**

7. Plaintiff purchased Verb securities during the Class Period at artificially inflated prices as set forth in the certification annexed hereto.

8. Defendant Verb is a Nevada corporation with its principal executive offices at 344 South Hauser Blvd., Suite 414, Los Angeles, CA 90036. Verb common stock trades under the ticker symbol "VERB" on the NASDAQ stock exchange.

9. Defendant Rory J. Cutaia served as Chairman of the Board of Directors and Chief Executive Officer of the Company at all relevant times.

10. Cutaia (a) directly participated in the management of the Company; (b) was directly involved in the day-to-day operations of the Company at the highest levels; (c) was privy to confidential proprietary information concerning the Company and its business and operations; (d) was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; (e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls; (f) was aware of or recklessly disregarded the fact that false and misleading statements

1   were being issued concerning the Company; and/or (g) approved or ratified these
2   statements in violation of the federal securities laws.

3        11.    Together, Verb and the Cutaia are referred to herein as "Defendants."

4   ## SUBSTANTIVE ALLEGATIONS

5   ## Background

6        12.    Verb purportedly operates as an applications services provider with
7   cloud-based software products for businesses.  As part of its business, Verb utilizes
8   interactive videos as part of its customer relationship management application.
9   Verb has formerly operated under the names of nFusz, Inc., bBooth, Inc., bBooth
10  (USA), Inc., and Cutaia Media Group, LLC.

11  ## Defendants' False and Misleading Class Period Statements

12       13.    On January 3, 2018, the Company announced a purported agreement
13  with Oracle America, Inc. (herein, the "Oracle Agreement") which received
14  widespread attention.

15       14.    The Company made this announcement via a filing with the SEC on
16  Form 8-K, which omitted the text of the agreement itself:

17      Item 1.01. Entry into a Material Definitive Agreement.

18

19      On January 2, 2018 we entered into an agreement with ORACLE
20      AMERICA, INC. ("ORACLE") (the "Agreement") pursuant to which
21      we agreed to develop an application (a "Partner Application" as
22      defined in the Agreement) to facilitate the integration of our
23      notifiCRM interactive video messaging technology into the NetSuite
24      Software-as-a-Service (SaaS) platform developed by ORACLE (the
25      "ORACLE SERVICE"), and to ensure the interoperability of our
26      notifiCRM technology with the ORACLE SERVICE. The Parties
27      intend that all ORACLE NetSuite customers (existing and future) that
28      pay an additional per user fee (discussed below), will have the ability

to create, edit, send, and track notifiCRM interactive video messaging seamlessly through the ORACLE NetSuite user interface. The ORACLE SERVICE integrates Enterprise Resource Planning, Customer Relationship Management, E-commerce (web site hosting, web store transactions) and partner collaboration capabilities.

**The Agreement provides that the development of the application, which will be undertaken jointly by us and ORACLE, will be completed within one year.** We anticipate that development of the application, which has already begun, will be completed within 120 days. The Agreement is for an initial term of one year, but renews automatically for successive one-year terms, unless sooner terminated in accordance with the termination provisions set forth in the Agreement.

Upon completion of development and testing of the application, **it will be marketed jointly by us and ORACLE, through, among other things, ORACLE'S existing network of approximately 2,000 ORACLE NetSuite sales reps**. Pricing is yet to be finalized, but it is estimated that the integrated notifiCRM feature set will be offered at a price of between $10 and $25 (or such higher price, depending upon the requested features and functionality) per user, per month, (the "notifiCRM Fee") which is in addition to the price each user pays for the ORACLE SERVICE. The Agreement provides that the notifiCRM fee will be shared between us and ORACLE as follows: 90% to us and 10% to ORACLE.

The Agreement contains covenants, representations and warranties of

1  us and ORACLE that are typical for agreements of this type,
2  including, among other things, provisions for confidentiality,
3  intellectual property, and the licensed use of each other's trademarks
4  for marketing purposes. The Agreement is non-exclusive. It is
5  currently contemplated that once the application is available to be
6  marketed to ORACLE customers, the Parties will prepare and
7  distribute a joint press release.

8

9  The foregoing description of the terms of the Agreement, does not
10  purport to be complete and is subject to and qualified in its entirety by
11  reference to the Agreement itself, the terms of which are incorporated
12  herein by reference. The benefits and representations and warranties
13  set forth in such document (if any) are not intended to and do not
14  constitute continuing representations and warranties of us or any other
15  party to persons not a party thereto.

16  Verb (formerly, nFusz, Inc.) Form 8-K (January 3, 2018) (emphasis added).

17  15.   Throughout the Class Period, the Company continued to tout this
18  relationship.  For example, on or about March 1, 2018, Company CEO Rory Cutaia
19  highlighted the agreement in an online video referring investors to the Company's
20  Form 8-K and stating:

21  The 300 billion dollar public company with who we just signed a
22  contract to incorporate our interactive video technology into their
23  CRM platform.  They have got millions of current subscribers and a
24  sales force of over 2,000 people who will market our product as an
25  upgrade feature to all of those customers.  And best of all, we keep
26  90% of the monthly recurring revenue from each one of those sales.

27

28

1    Game changer for us and a huge advancement for them.[1]

2    16.    Cutaia made similar statements that Oracle would issue a joint press

3    release to announce the incorporation of the Company's technology in "30 to 45

4    days" and that Oracle's salesforce of 2,000 employees would sell the Company's

5    technology as an "upgrade" to NetSuite in an interview with Uptick Newswire

6    posted on February 23, 2018.  *See CEO Rory Cutaia of nFusz, Inc.(OTCQB:*

7    *FUSZ) - Feb '18 update*, Uptick Newswire (Feb. 23, 2018) at 5:52-10:00,

8    https://www.youtube.com/watch?v=LeAIX-m4kuI.

9    17.    The Company also disclosed the Oracle Agreement in an Annual

10   Form 10-K filed on April 2, 2018, which stated:

11         We enter into license or partnership agreements with other CRM

12         providers to incorporate our notifiCRM technology into such other

13         CRM providers' software platform that they offer to their existing and

14         prospective client base, for an additional monthly fee which is shared

15         with us. In January 2018, we entered into such an agreement with

16         Oracle America, Inc. to integrate our notifiCRM product into their

17         NetSuite platform on a revenue share basis.

18   18.    During the Class Period the stock increased from approximately $0.12

19   per share on January 3, 2018 to $2.70 per share on April 19, 2018, an astonishing

20   increase of over 2000%.

21   19.    The statements referenced in ¶¶ 14-17 above were materially false

22   and/or misleading because they misinterpreted and failed to disclose the following

23   adverse facts pertaining to the Company's business and operations which were

24   known to Defendants or recklessly disregarded by them.  Specifically, Defendants

25   _____

26   [1]  Periodicvideos, *nFusz - Fusz Opportunity of a Lifetime*, YouTube (Mar. 1, 2018),
     https://www.youtube.com/watch?v=N314LB_WBAQ;          *see          also*          nFusz,

27   https://nfusz.com/super/ajax/ajax2.php?mediaid=iGN5dg (last visited July 9, 2019).   The
     Company issued many such videos directed to shareholders in possible violation of Regulation

28   FD by failing to file concurrent Form 8-K's.

1  made false and/or misleading statements as to the scope of the Agreement with

2  Oracle as  the Company did not have a contract with Oracle to jointly develop and

3  market the Company's product and that as a result of the foregoing, the Company's

4  public statements were materially false and misleading at all relevant times.

5  **The Truth Emerges**

6  20.   Following the rapid rise of the Company's stock price, on April 23,

7  2018, the truth as to the Company's relationship with Oracle began to emerge.

8  21.   First, the Company revealed the actual terms of the Oracle Agreement

9  through the filing of a Form 8-K.

10  22.   The terms of the agreement revealed that the prior representations as

11  to the scope of the relationship with Oracle were materially misleading.   For

12  example, the Oracle Agreement stated:

13

14  4.   Partner Program Requirements.

15

16  4.8. Development. Partner will develop and make commercially

17  available at least one (1) Partner Application or Partner Connector

18  within one (1) year from the Effective Date.

19  * * *

20  4.10. Inspection. Only Partner Applications or Partner Connectors

21  authorized by Oracle may be made available to Customers. Oracle's

22  authorization of a Partner Application or Partner Connector does not

23  mean that Oracle has inspected or reviewed the Partner Application or

24  Partner Connector. Oracle may inspect the Partner Application or

25  Partner Connector, including the source code and documentation

26  related thereto, at any time during the Term. If, during such

27  inspection, Oracle determines that the Partner Application or the

28  Partner Connector is in violation of this Agreement, including any

security requirements, any Partner Program rules, or the Marketing Guidelines, or is otherwise unsatisfactory, Oracle may terminate this Agreement, require that Partner modify the Partner Application or Partner Connector, or suspend Partner's access to the Service until the violation or other issues are resolved.

* * *

5. Marketing.

5.1. Participation on SuiteApp.com. Within one (1) month from the commercial availability of Partner Application or Partner Connector or upon request from Oracle, Partner will provide marketing information about Partner, the Partner Application, or the Partner Connector ("Marketing Materials") to be posted on the SuiteApp.com area of the Oracle website, in the Partner Program newsletter, or in connection with any Oracle marketing activities. Partner grants to Oracle a non-exclusive, worldwide, fully-paid, royalty free license during the Term to use the Marketing Materials, including any of Partner's Marks, trade names, or other trademarks included therein, in connection with any Oracle marketing activities, and to list Partner as a Oracle partner wherever such lists may appear. Oracle reserves the right, in its sole discretion, to refuse to list the Partner Application or Partner Connector on SuiteApp.com or to remove or modify Marketing Material. For avoidance of doubt, only Partner Applications and Partner Connectors that have met the requirements of the Quality Program as set forth in Section 4.12 will be listed on SuiteApp.com.

* * *

5.4. Partner Activities. Unless otherwise expressly authorized in

- 8 -

advance in writing by Oracle, Partner will not in any way express or imply that any opinions contained in Partner's promotional activities are endorsed by Oracle. Neither Partner, nor someone acting for Partner, will solicit any persons or entities which Partner knows to be (or should reasonably know to be) an Oracle Customer for any purpose, except for the purpose of promoting the applicable Partner Application, Partner Connector, or Oracle products and services. Partner will not diminish or damage the reputation or goodwill of Oracle or the Service.

* * *

14. Publicity. Subject to the permission granted in Section 5 of this Agreement, neither Party will issue any press release, make a public statement, or publicize this Agreement, without the prior written consent of the other Party. Notwithstanding the foregoing, each Party will be entitled to comply with government reporting obligations and information request in connection with this Agreement.

23.    The text of the Oracle Agreement revealed that there was no joint agreement for Oracle to use its substantial salesforce to market the Company's product as previously touted by the Company and its CEO. Similarly, the text of the Oracle Agreement revealed that there was no joint development of the Company's product, notifiCRM.

24.    Moreover, the text of the Oracle Agreement revealed the true nature of the relationship between Oracle and the Company: the Company had simply been provided with an application developer toolkit for its program to interface with Oracle NetSuite. The Company and Cutaia had exceedingly overstated this relationship and omitted from all prior communications about the Oracle Agreement that the Company had to pay a fee to Oracle in order to participate in

the partnership program and access nothing more than an application developer toolkit.

25.    The Oracle Agreement revealed that the Company had made misleading statements pertaining to Oracle's acts upon completion of the product, despite such statements having been explicitly prohibited by the Oracle Agreement.

26.    Nonetheless, the transmittal Form 8-K on April 23, 2018 assured investors that:

> A press release we approved announcing the [the integration of the Company's product with Oracle's NetSuite] has been prepared but we have been advised that it is awaiting final review and approval by certain parties, including the Oracle NetSuite CEO, after which, subject to any changes, will be distributed to the news wires. We have requested that the review and approval process be expedited.

27.    On April 30, 2018, CEO Rory Cutaia issued a video to Company shareholders assuring investors that a joint press release would be coming from Oracle "within days" though there were a number of complicating factors.  No joint press release was ever issued and the market increasingly questioned the relationship between the two companies.

28.    As the market digested the true nature of the Oracle Agreement, the stock began a precipitous decline, closing on April 30, 2018 at $1.54 per share, a decrease of 43% from the high a week prior.  The market continued to digest this information and by the market close on May 2, 2018, the Company's stock was trading at $1.08 per share, a decrease of 60% from the high a week prior.

29.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other members of the Class have suffered significant losses and damages.

## ADDITIONAL ALLEGATIONS OF SCIENTER

30.    As alleged herein, Defendants acted with scienter since they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, and/or receipt and/or modification of Company's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

31.    The statutory safe harbor provided for certain forward-looking statements does not apply to any of the false statements alleged herein.  None of the statements alleged herein is a "forward-looking statement" and no such statement was identified as a "forward-looking statement" when made.  Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made.  Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any forward-looking statements.

32.    In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein that is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because, at the time each such statement was made: (i) the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statement was materially false or misleading and/or omitted facts necessary to make statements previously made not

materially false and misleading; and/or (ii) each such statement was authorized and/or approved by a director and/or executive officer of the Company who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made.

33.     None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Verb securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

35.     The members of the Class are so numerous that joinder of all members is impracticable, since Verb has millions of shares of stock outstanding and because the Company's shares were actively traded on the NASDAQ.  As of April 2, 2018, Verb had more than 79 million shares issued and outstanding.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

36.     There is a well-defined community of interest in the questions of law

and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual Class members, include, *inter alia*:

    (a)    whether the Defendants violated the Exchange Act;

    (b)    whether the Defendants omitted and/or misrepresented material facts in their publicly-disseminated reports, press releases, and statements during the Class Period;

    (c)    whether the price of Verb securities was artificially inflated during the Class Period as a result of the material omissions and/or misrepresentations complained of herein; and

    (d)    whether the members of the Class have sustained damages as a result of the decline in value of Verb's stock when the truth was revealed.

37.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from the Defendants' wrongful conduct in a substantially identical manner.

38.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the other members of the Class.

39.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

## COUNT I
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants)

40.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

41.    This Count, asserted against all of the Defendants, is based upon

- 13 -

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

42.    During the Class Period, the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and/or misleading statements specified above, which they knew or deliberately disregarded were false and/or misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

43.    The Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

    (a)    Employed devices, schemes and artifices to defraud;

    (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and/or

    (c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Verb securities during the Class Period.

44.    The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Verb were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These Defendants, by virtue of their receipt of information reflected the true facts regarding Verb, their control over and/or receipt of and/or modification of Verb's allegedly materially false and misleading statements, and/or their associations with the Company,

which made them privy to confidential proprietary information concerning Verb, participated in the fraudulent scheme alleged herein.

45.     Cutaia, who is a senior officer and director of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Verb personnel to members of the investing public, including Plaintiff and the Class.

46.     As a result of the foregoing, the market price of Verb securities was artificially inflated during the Class Period.  Unaware of the falsity of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Verb securities during the Class Period in purchasing Verb securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

47.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

48.     By reason of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for the substantial damages they suffered in connection with their purchases of Verb securities during the Class Period.

## COUNT II

**(Violation of Section 20(a) of the Exchange Act Against Rory Cutaia)**

49.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.     During the Class Period, Cutaia participated in the operation and

management of Verb and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  As a consequence of his senior position, Cutaia knew or recklessly disregarded the fact that the adverse information specified herein had not been disclosed to, and was being concealed from, the investing public.  Plaintiff and the other members of the Class had no access to such information, which was and is solely under the control of the Defendants.

51.    As an officer and director of a publicly-owned company, Cutaia had a duty to disseminate accurate and truthful information about the Company to the investing public, and to correct promptly any public statements issued by Verb that had become materially false or misleading.

52.    As a result of his position of control and authority as a senior officer and director of the Company, Cutaia was able to, and did, control the contents of the various reports, press releases, and public filings that Verb disseminated in the marketplace during the Class Period concerning its business operations. Throughout the Class Period, Cutaia exercised his power and authority to cause Verb to engage in the wrongful acts complained of herein.  Cutaia therefore, was a "controlling person" of Verb within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged herein, which artificially inflated the market price of Verb securities.

53.    By reason of the above conduct, Cutaia is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Verb.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

(A)    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiff as class representative and Plaintiff's counsel as Class Counsel;

(B)    Awarding compensatory damages in favor of Plaintiff and the other

members of the Class against all of the Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees and expert fees; and

(D)    Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: July 9, 2019                    **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:        */s/ Rachele R. Byrd*
                RACHELE R. BYRD

RACHELE R. BYRD
BRITTANY N. DEJONG
750 B Street, Suite 1820
San Diego, CA 92101
Telephone:   619/239-4599
Facsimile:    619/234-4599
byrd@whafh.com
dejong@whafh.com

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
MATTHEW M. GUINEY
KEVIN G. COOPER
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114

- 17 -

1    guiney@whafh.com
2    kcooper@whafh.com

3    *Counsel for Plaintiff*

VERB: 25733

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PLAINTIFF'S CERTIFICATION

**Scott C. Hartmann** ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed the complaint and authorized the commencement of a federal securities class action on Plaintiff's behalf.

2.  Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff's transactions in Verb Technology Company, Inc. during the Class Period specified in the Complaint are as follows:

## SEE ATTACHED SCHEDULE A

5.  During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___3___ day of July 2019.

**Scott C. Hartmann**

**Schedule A to Certification of Scott C. Hartmann**
**Verb Technology Company. Inc.**

**PURCHASES**

| Date | No. of shares | Actual price per share |
|------|---------------|------------------------|
| 04/09/18 | 6,908 | $1.60 |
| 04/10/18 | 800 | $2.03 |
| 04/10/18 | 1,800 | $1.99 |
| 04/11/18 | 200 | $1.92 |
| 04/13/18 | 1,310 | $1.82 |
| 04/17/18 | 300 | $2.20 |
| 04/20/18 | 650 | $2.53 |
| 04/23/18 | 400 | $2.59 |
| 04/23/18 | 3,000 | $2.49 |
| 04/24/18 | 1,000 | $1.99 |
| 04/25/18 | 1,400 | $2.05 |
| 04/26/18 | 2,060 | $1.60 |
| 04/26/18 | 500 | $1.49 |

**SALES**

| Date | No. of shares | Actual price per share |
|------|---------------|------------------------|
| 04/19/18 | 4,000 | $2.58 |
| 04/19/18 | 2,000 | $2.58 |
| 04/19/18 | 1,300 | $2.58 |

**Note: Price per share denotes actual price paid or sold, unadjusted for 1 for 15 reverse split in March 2019**