Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SCOTT C. HARTMANN, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>VERB TECHNOLOGY COMPANY, INC., and RORY J. CUTAIA,<br><br>Defendants. | No. 2:19-cv-05896-GW-MAA<br><br>**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

Lead Plaintiff J. Leister and named Plaintiff Alexander Wolfson ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, announcements and online investor videos made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Verb Technology Company, Inc. ("Verb" or "Company"), f/k/a nFüsz, Inc., and information readily available on the Internet. Plaintiffs believe that substantial evidentiary support exists for these allegations and will be further revealed after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons who purchased or otherwise acquired Verb securities between January 3, 2018 and May 2, 2018, both days inclusive ("Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and its CEO, Rory Cutaia.

2. At the beginning of 2018, Verb (then operating as nFüsz) was a development-stage software company. The Company needed cash to continue developing cloud-based business software on which its future depended. As of December 31, 2017, according to its SEC filings, the Company had incurred a net loss for the year of nearly $5 million, had no means of generating revenue, held only $10,560 in cash, and reported a working capital deficit of nearly $6 million.

Accordingly, the Company required outside financing to fund its continuing operations.

3. Before the market opened on January 3, 2018, Defendants filed with the SEC a Current Report on Form 8-K ("January 3 8-K"), disclosing that the Company and business software giant Oracle America, Inc. ("Oracle") had just executed a joint development and joint marketing agreement ("Oracle Agreement") with respect to an application "to facilitate integration of [Verb's] notifiCRM interactive video messaging technology into [Oracle's] NetSuite Software-as-a-Service platform." The Company's CEO, Cutaia, later touted the Oracle Agreement as a "game changer," and a "big deal[] for us, big relationship[], massive value creation for you [Verb investors] and us," in online videos directed at investors.

4. Defendants extolled the potential of the Oracle Agreement and purported to incorporate it by reference into the January 3 8-K, but they did not append the actual Oracle Agreement as an exhibit to that filing. Nor did Defendants disclose the full text or terms of the Oracle Agreement in any form at this time.

5. Nonetheless, Defendants' disclosure that they had entered into the Oracle Agreement generated an immediate bump in the Company's stock price from a January 2, 2018 close of $0.10 to a January 3, 2018 close of $0.13, a 30% increase on relatively high trading volume. Defendants continued promoting the Oracle Agreement and the incumbent boon to the Company of Oracle's joint marketing capabilities, providing updates to investors on the Oracle Agreement throughout the Class Period.

6. During the first quarter of 2018, after disclosing and touting the Oracle Agreement, Defendants raised over $2.5 million in net proceeds from financing activities – over six times what the Company had raised during the first quarter of 2017. Specifically, the Company raised approximately $2.3 million in proceeds from its issuance of common stock, and another $1 million through the exercise of

a put option. The increased stock price also helped the Company avoid a materially greater dilutive effect from the exercise of the put option.

7. Defendants' January 3, 2018 disclosure about the Oracle Agreement, however, was a lie. On April 23, 2018, having successfully raised millions of dollars in essential operating capital, the Company disclosed the Oracle Agreement in full. Directly contrary to Defendants' representations, the Oracle Agreement did not provide for Oracle to jointly market or jointly develop the Company's notifiCRM product. Rather, the full Oracle Agreement showed that all the Company had was an application developer toolkit and the standard form agreement that Oracle used with companies seeking to develop applications for its NetSuite platform.

8. The same day that Defendants finally disclosed the full Oracle Agreement, revealing the truth about Oracle's obligations (or rather the lack thereof) with respect to developing and marketing notifiCRM, the Company's stock price fell substantially. Defendants, however, reassured investors, stating that the Company and Oracle would imminently issue a joint press release regarding the Oracle Agreement. Defendants and Oracle, however, never issued a joint press release. The Company's stock price continued to fall, dropping a total of $1.55 and losing 59% of its value by May 2, 2018, damaging investors.

## JURISDICTION & VENUE

9. The federal law claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC.

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as well as Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11. This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render

the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District, and Verb's U.S. offices are located within this District.

13. In connection with the acts, conduct, and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

14. Lead Plaintiff J. Leister, as set forth in his certification on file with the Court (ECF No. 26-2) and incorporated by reference herein, acquired Verb securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15. Named Plaintiff Alexander Wolfson, as set forth in his PSLRA Certification attached hereto as Exhibit A, acquired Verb securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16. Defendant Verb is a Nevada corporation with its principal executive offices located at 344 South Hauser Blvd., Suite 414, Los Angeles, CA 90036. Verb common stock currently trades under the ticker symbol "VERB" on the NASDAQ stock exchange. Verb securities previously traded on the OTC and OTCQB market (together, "OTC") under the ticker symbols "FUSZ" and "VRRB" before up-listing to the NASDAQ stock exchange on April 5, 2019. The Company operated under

the name nFüsz, Inc. ("nFüsz") between April 21, 2017 and February 1, 2019, when the Company changed its corporate name to Verb Technology Company, Inc.

17. Defendant Rory J. Cutaia founded the Company in December 2012. He served as Chairman of the Board of Directors, CEO, President, Secretary, and Treasurer of the Company at all relevant times.

18. Cutaia (a) directly participated in the management of the Company; (b) was directly involved in the day-to-day operations of the Company at the highest levels; (c) was privy to confidential proprietary information concerning the Company and its business and operations; (d) was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; (e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls; (f) was aware of or recklessly disregarded the fact that false and misleading statements were being issued concerning the Company; and/or (g) approved or ratified these statements in violation of the federal securities laws.

19. Together, Verb and Cutaia are "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Company Background

20. Between April 21, 2017 and February 1, 2019, the Company was known as nFüsz.[1] nFüsz was a small, development-stage company with seven total full-time employees. The Company purported to sell subscriptions to cloud-based business software including notifiCRM, customer relationship management

[1] The Company operated as bBooth, Inc., prior to becoming nFüsz. bBooth, Inc. manufactured, marketed, and operated audition booths in shopping malls and other high-traffic venues in the United States. The audition booths were portable recording studio kiosks, called "bBooths," in which customers could audition for TV shows such as American Idol in their local geographic areas.

("CRM") software that employs interactive video to assist sales and marketing personnel communicate with their clients and prospective clients.

21. CRM refers to methodologies, software and Internet capabilities that allow companies to manage their relationships with current and potential customers. Companies use CRM software applications to organize, automate and synchronize sales, marketing, customer service, and technical support. These applications may be available through software-as-a-service ("SaaS") platforms.

22. According to the Company, subscribers use notifiCRM to embed active links in videos, which clients or prospects can use to respond to the subscribers' calls to action (such as direct links to purchase or to contact the subscriber/company) in real time without leaving or stopping the video. notifiCRM also provided subscribers with access to analytics on viewership, engagement, and interactions. The Company claimed to have developed proprietary interactive video technology which serves as the basis for notifiCRM.

**With No Appreciable Cash Holdings or Revenue, The Company Needed Investor Money to Fund Its Operations**

23. On October 13, 2017, the Company filed an S-1 Registration Statement with the SEC ("2017 S-1"). In the 2017 S-1, the Company disclosed that "[t]o date, we have not derived any revenues from our operations and have incurred losses since inception. … We will need to raise additional working capital to continue our normal and planned operations." The Company also disclosed in the 2017 S-1 that "[o]ur independent auditors have indicated in their report on our December 31, 2016 consolidated financial statements that there is substantial doubt about our ability to continue as a going concern."

24. In the 2017 S-1, the Company explained that "we expect that we will need to obtain substantial additional funding in order to continue our operations. To date, we have financed our operations entirely through equity and debt investments

by founders and other investors and the incurrence of debt, and we expect to continue to do so in the foreseeable future."

25. The Company cautioned in the 2017 S-1 that "[o]ur ability to grow and compete in the future will be adversely affected if adequate capital is not available to us or not available on terms favorable to us." The Company also warned that "[w]e will need substantial additional funding to continue our operations, which could result in dilution to our stockholders. We may not be able to raise capital when needed, if at all, which could cause us to have insufficient funds to pursue our operations, or to delay, reduce or eliminate our development of new programs or commercialization efforts."

26. On April 2, 2018, the Company filed its annual report for the year ended December 31, 2017 with the SEC on Form 10-K ("2017 10-K"). In the 2017 10-K, the Company revealed that as of December 31, 2017, the Company had only $10,560 in cash and a working capital deficit of $5,828,371. The Company reported net sales for all of 2017 of $5,914, after reporting zero sales the previous year. In 2017, the Company incurred net loss from operations of $4,696,835.

27. The Company also stated in the 2017 10-K that:

> We estimate our operating expenses for the next twelve months will continue to exceed any revenues we generate, and we will need to raise capital through either debt or equity offerings to continue operations.
>
> We are in the early stages of our business. We are required to fund growth from financing activities, and we intend to rely on a combination of equity and debt financings.

28. The 2017 10-K also reiterated many of the same warnings to investors as did the 2017 S-1. Specifically, the 2017 10-K disclosed that:

- "Our independent auditors have indicated in their report on our December 31, 2017 consolidated financial statements that there is substantial doubt about our ability to continue as a going concern."
- "To date, we have not derived any revenues from our operations and have incurred losses since inception. … We will need to raise additional working capital to continue our normal and planned operations."
- "[W]e expect that we will need to obtain substantial additional funding in order to continue our operations. To date, we have financed our operations entirely through equity investments by founders and other investors and the incurrence of debt, and we expect to continue to do so in the foreseeable future."
- "Our ability to grow and compete in the future will be adversely affected if adequate capital is not available to us or not available on terms favorable to us."
- "We will need substantial additional funding to continue our operations, which could result in dilution to our stockholders. We may not be able to raise capital when needed, if at all, which could cause us to have insufficient funds to pursue our operations, or to delay, reduce or eliminate our development of new programs or commercialization efforts."

**The Company Announces The Oracle Agreement**

29. On January 3, 2018, before market open, the Company filed the January 3 8-K, announcing that the Company had entered into the Oracle Agreement. As Defendants would later reveal, Cutaia signed the Oracle Agreement on December 27, 2017, and Oracle signed on January 2, 2018.

30. According to Oracle's annual report for the fiscal year ended May 31, 2018:

> [Oracle] provides products and services that address all aspects of corporate information technology (IT) environments—applications, platform and infrastructure. Our applications, platform and infrastructure offerings are delivered to customers worldwide through a variety of flexible and interoperable IT deployment models, including cloud-based, on-premise, or hybrid, which enable customer choice and flexibility. We market and sell our offerings globally to businesses of many sizes, government agencies, educational institutions and resellers with a worldwide sales force positioned to offer the combinations that best meet customer needs.

31. In its 2018 annual report, Oracle reported nearly $40 billion in revenues, and employed approximately 137,000 full-time employees, including approximately 39,000 in sales and marketing.

32. Oracle acquired NetSuite Inc. ("NetSuite") on November 7, 2016 for a total purchase price of approximately $9.1 billion. NetSuite is a leading provider of cloud-based enterprise resource planning software and related applications, including CRM.

33. In 2018, Oracle (and NetSuite) accounted for approximately 5.5% of the $48 billion worldwide market for CRM software, generating approximately $2.67 billion in revenue, and trailing only Salesforce and SAP.

34. NetSuite's SuiteApp marketplace serves as a platform for hundreds of SuiteCloud Development Network ("SDN") partners, each offering various software extensions and plugins for NetSuite. Potential SDN partners can apply on the NetSuite website to develop an application to integrate their software into the NetSuite platform.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

35. In relevant part, the January 3 8-K stated:

> Item 1.01. Entry into a Material Definitive Agreement.
>
> On January 2, 2018 we entered into an agreement with ORACLE AMERICA, INC. ("ORACLE") (the "Agreement") pursuant to which we agreed to develop an application (a "Partner Application" as defined in the Agreement) to facilitate the integration of our notifiCRM interactive video messaging technology into the NetSuite Software-as-a-Service (SaaS) platform developed by ORACLE (the "ORACLE SERVICE"), and to ensure the interoperability of our notifiCRM technology with the ORACLE SERVICE. The Parties intend that all ORACLE NetSuite customers (existing and future) that pay an additional per user fee (discussed below), will have the ability to create, edit, send, and track notifiCRM interactive video messaging seamlessly through the ORACLE NetSuite user interface. The ORACLE SERVICE integrates Enterprise Resource Planning, Customer Relationship Management, E-commerce (web site hosting, web store transactions) and partner collaboration capabilities.
>
> ***The Agreement provides that the development of the application, which will be undertaken jointly by us and ORACLE, will be completed within one year.*** We anticipate that development of the application, which has already begun, will be completed within 120 days. The Agreement is for an initial term of one year, but renews automatically for successive one-year terms, unless sooner terminated in accordance with the termination provisions set forth in the Agreement.
>
> ***Upon completion of development and testing of the application, it will be marketed jointly by us and ORACLE, through, among other things, ORACLE'S***

> ***existing network of approximately 2,000 ORACLE NetSuite sales reps.*** Pricing is yet to be finalized, but it is estimated that the integrated notifiCRM feature set will be offered at a price of between $10 and $25 (or such higher price, depending upon the requested features and functionality) per user, per month, (the "notifiCRM Fee") which is in addition to the price each user pays for the ORACLE SERVICE. The Agreement provides that the notifiCRM fee will be shared between us and ORACLE as follows: 90% to us and 10% to ORACLE.
>
> The Agreement contains covenants, representations and warranties of us and ORACLE that are typical for agreements of this type, including, among other things, provisions for confidentiality, intellectual property, and the licensed use of each other's trademarks for marketing purposes. The Agreement is non-exclusive. It is currently contemplated that once the application is available to be marketed to ORACLE customers, the Parties will prepare and distribute a joint press release.

(Emphasis added).

36. The foregoing statement was false and misleading because, as later revealed when the Company disclosed the Oracle Agreement in full, Defendants knew or were deliberately reckless in not knowing that: (1) the Oracle Agreement did not provide that Oracle and the Company would jointly develop an application to integrate notifiCRM into the NetSuite Saas platform; (2) Oracle did not have any obligation, and had expressed no intent, to jointly develop the application with the Company; (3) the Oracle Agreement did not provide that Oracle and the Company would jointly market the application integrating notifiCRM into the NetSuite Saas platform; and (4) Oracle did not have any obligation, and had expressed no intent, to jointly market the application with the Company.

37. Following the Company's January 3, 2018 announcement of the Oracle Agreement, its stock price closed 30% higher than the previous day, and trading volume increased more than ten-fold.

38. Throughout the Class Period, Defendants continued to tout the progress of the Oracle Agreement as the 120 days to completion Defendants promised passed. For example, in a video interview that Uptick Newswire posted on February 23, 2018, Cutaia provided an update to investors on the Oracle Agreement. Cutaia stated that Oracle would issue a joint press release with the Company in "30 to 45 days" concerning the Oracle Agreement, and that Oracle's salesforce of 2,000 employees would sell the Company's technology as an upgrade to NetSuite.[2]

39. Specifically, Cutaia stated in the video that:

> We've entered into a contract with Oracle NetSuite that was announced through an 8-K filing about a month or so ago now. … They've got 2,000 sales people that market the product to their customers, stay in touch with their customers. Now they're going to have an opportunity to go back to those customers, 2,000 sales people that are going to go back to millions of customers and say "hey, for a modest upgrade price of somewhere between $10 to 20 bucks a month, you can have access to this fantastic new interactive video lead generation tool, right built into the platform for you."

40. The foregoing statement was false and misleading because Defendants knew or were deliberately reckless in not knowing that Oracle's NetSuite salesforce of 2,000 people would not actively market the Company's application integrating

---

[2] *CEO Rory Cutaia of nFusz, Inc.* (OTCQB:FUSZ) - Feb '18 update, UPTICK NEWSWIRE (Feb. 23, 2018) at 5:52-10:00, *available at* https://www.youtube.com/watch?v=LeAIX-m4kuI (last visited December 3, 2019).

notifiCRM into the NetSuite SaaS platform. Cutaia specifically referred investors to the January 3 8-K announcing the Oracle Agreement, in which Defendants had previously issued the false and misleading statements that Oracle would jointly develop and jointly market the application. Cutaia therefore incorporated the previous false and misleading statements by reference, creating the misleading impression that Oracle was obligated, or expressly intended, to use its sales force to jointly market the Company's application, which was not true.

41. The video was posted prior to market open on February 23, 2018, and the Company's stock price climbed $0.10, or 20%, that same day.

42. On or about March 1, 2018, Cutaia highlighted the Oracle Agreement in another online video, providing a further update to investors. In this video, Cutaia spoke about the Company's deal with Oracle and referred investors to (and directed them to download) the January 3 8-K. Cutaia also stated:

> The $300 billion public company with who we just signed a contract to incorporate our interactive video technology into their CRM platform. ***They have got millions of current subscribers and a sales force of over 2,000 people who will market our product as an upgrade feature to all of those customers***. And best of all, we keep 90% of the monthly recurring revenue from each one of those sales. Game changer for us and a huge advancement for them.[3]

43. The foregoing statement was false and misleading because Defendants knew or were deliberately reckless in not knowing that: (1) the Oracle Agreement did not provide that Oracle and the Company would jointly market the application

[3] Periodic videos, *nFusz - FUSZ Opportunity of a Lifetime*, YOUTUBE (Mar. 1, 2018) at 3:45-4:17, https://www.youtube.com/watch?v=N314LB_WBAQ (last visited December 3, 2019). The Company also posted the same video on its website for investors, at https://nfusz.com/super/ajax/ajax2.php?mediaid=iGN5dg.

integrating notifiCRM into the NetSuite Saas platform; (2) Oracle did not have any obligation, and had expressed no intent, to jointly market the application with the Company; (3) Cutaia specifically directed investors to the January 3 8-K, incorporating Defendants' previous false statements by reference and reasserting that Oracle would use its sales force to jointly market the Company's application, which was not true.

**The Company Raised Millions Through Selling Its Common Stock After Announcing the Oracle Agreement**

44. Defendants' false and misleading statements artificially inflated the Company's stock price during the Class Period. This helped Defendants raise critical capital through selling the Company's common stock at higher prices than they would otherwise be able to obtain absent the artificial inflation.

45. On May 15, 2018, the Company filed its quarterly report with the SEC on Form 10-Q for the quarter ended March 31, 2018 ("Q1'18 10-Q"). In the Q1'18 10-Q, the Company disclosed that as of March 31, 2018, the Company had approximately $1.6 million in cash – approximately $1.6 million more cash than the Company had three months earlier, as per the 2017 10-K. The Company explained that during the first quarter of 2018, it had enhanced its cash position primarily from proceeds from the sale of common stock:

> Our cash provided by financing activities for the three months ended March 31, 2018 amounted to $2,585,500 which represented $2,278,500 of proceeds received from issuances of common stock, proceeds from issuance of common shares of $1,000,000 from exercise of Put option, $130,000 of proceeds from the issuance of convertible debt, and $22,000 of proceeds from the exercise of warrants, offset by $845,000 of convertible debt payments.

46. In comparison, the Company disclosed that "[o]ur cash provided by financing activities for the three months ended March 31, 2017 amounted to $425,000 which represented $170,000 of proceeds received from issuances of common stock and $255,000 of proceeds received from the issuance of convertible series A preferred stock." Thus, the amount of cash Defendants raised from financing activities in the first quarter of 2018 was ***over six times*** what they had raised in the first quarter of 2017.

47. The Q1'18 10-Q also disclosed that the Company had net sales in the quarter of $8,003, contributing to a net loss from operations of $5,391,571.

48. On August 14, 2018, the Company filed its quarterly report for the quarter ended June 30, 2018 with the SEC on Form 10-Q ("Q2'18 10-Q"). In the Q2'18 10-Q, the Company disclosed that as of March 31, 2018, the Company had approximately $1.4 million in cash. The Company revealed that during the six months ended June 30, 2018, it raised net cash proceeds of $2,978,500 from issuing shares of its commons stock to investors, meaning that Defendants raised an additional $700,000 in net cash proceeds from the sale of the Company's common stock during the second quarter of 2018.

49. The Q2'18 10-Q also disclosed that the Company had net sales in the quarter of $8,239.

50. In addition to selling its common stock, Verb raised much needed operating cash by means of a sale of shares which Verb had registered in late 2017. On October 27, 2017, Verb filed with the SEC an amended Registration Statement on Form S-1, registering for sale up to 25 million shares of its common stock. The Registration Statement had an effectiveness date of November 13, 2017 at 4:00 p.m. According to the Company, the Registration Statement:

> "relates to the offer and resale by Kodiak Capital Group, LLC ("Kodiak") . . . of up to 25,000,000 shares of our common stock that Kodiak has agreed to purchase from

> us in accordance with the terms and conditions of an Equity Purchase Agreement, dated September 15, 2017 (the "Purchase Agreement"), . . . pursuant to which we have the right to "put" to Kodiak (the "Put") up to $2 million in shares of our common stock. All of the shares, when sold, will be sold by Kodiak."

51. While Verb would receive no proceeds from the sale of the 25 million shares, the Put enabled Verb to put shares of its common stock to Kodiak from time to time over the coming year in exchange for cash of up to $2 million. This provided the Company with a means of obtaining critical operating cash during the Commitment Period that "end[ed] on the earlier of (i) the date on which the Investor shall have purchased Put Shares pursuant to this Agreement equal to the Maximum Commitment Amount, (ii) September 15, 2019, or (iii) written notice of termination by [Verb] to [Kodiak] or upon a material breach of this Agreement by [Kodiak]."

52. Also on October 27, 2017, the Company filed with the SEC an amended Current Report on Form 8-K, amending its prior disclosure of the September 15, 2017 Purchase Agreement, stating in relevant part:

> This Form 8-K/A is filed to correct certain typographical errors contained in the Equity Purchase Agreement ("Purchase Agreement") dated September 15, 2017 and effective September 26, 2017 between us and Kodiak Capital Group, LLC ("Kodiak Capital") (hereinafter referred to as "Purchaser"), previously filed as an exhibit to our Company's Current Report on Form 8-K on October 2, 2017. Under the Purchase Agreement, we may from time to time, in our discretion, sell shares of our common stock to Purchaser for aggregate gross proceeds of up to $2,000,000. Unless terminated earlier, Purchaser's purchase commitment will automatically terminate on the earlier of the date on which such Purchaser shall have purchased our shares pursuant to the Purchase Agreement for an aggregate purchase price of $2,000,000, or September 15, 2019. We have no

> obligation to sell any shares under the Purchase Agreement.
>
> As provided in the Purchase Agreement, we may require the Purchaser to purchase shares of our common stock from time to time by delivering a put notice ("Put Notice") to the Purchaser specifying the total number of shares to be purchased (such number of shares multiplied by the purchase price described below, the "Investment Amount"); provided there must be a minimum of ten trading days between delivery of each put notice. …
>
> ***For each share of our common stock purchased under the Purchase Agreement, the Purchaser will pay a purchase price equal to 80% of the Market Price***. The Market Price is defined as the VWAP on the principal trading platform for the Common Stock, as reported by OTC Markets, during the five consecutive Trading Days immediately preceding the date (the "Closing Request Date") that Kodiak receives a Put Notice from us (the "Valuation Period"). Purchaser's obligation to purchase shares is subject to customary closing conditions, including without limitation a requirement that a registration statement remain effective registering the resale by Purchaser of the shares to be issued under the Purchase Agreement and the Warrants (the "Registration Statement"). The Purchase Agreement is not transferable and any benefits attached thereto may not be assigned.

(Emphasis added).

53. Subject to the terms and conditions of the Purchase Agreement, therefore, Verb had the right to raise up to $2,000,000 in cash from Kodiak by means of the Put. The number of shares that Verb put to Kodiak to raise those funds, however, would fluctuate with the market price of Verb's common stock. The higher the market price of Verb common stock, the fewer shares Verb would need to put to Kodiak to raise the same amount of funds.

54. According to the Purchase Agreement, the Purchase Price for the Put shares "shall mean 80% of the Market Price on such date on which the Purchase Price is calculated in accordance with the terms and conditions of this Agreement." In turn, the Purchase Agreement defined the Market Price as "the [volume weighted average price ("VWAP")] of the Common Stock on the Principal Market during the Valuation Period, as reported by OTC Markets or such other Principal Market" where the Valuation Period was the "five (5) Trading Days immediately preceding the Closing Request Date associate with the applicable Put Notice during which the Purchase Price of the common stock is valued."

55. For the five trading days prior to September 15, 2018, Verb common stock closed at an average price of $0.10/share. By way of example, therefore, as of the close of trading on the date of the Purchase Agreement, the $2,000,000 "Maximum Commitment Amount" would have represented 25,000,000 shares of Verb common stock.

56. Verb did not immediately exercise the Put, in part or in whole. Rather, Defendants waited until the first quarter of 2018. On March 9, 2018, Verb filed with the SEC a Current Report on Form 8-K, disclosing "Other Events," relating to its means of obtaining financing during the first quarter of 2018 ("March 9 8-K"). In relevant part, the March 9 8-K states:

> As reported on Form 8-K filed on October 2, 2017, and on Form 8-K/A, filed on October 26, 2017 (referred to collectively as the "October Form 8-K"), we entered into an Equity Purchase Agreement ("Purchase Agreement"), dated September 15, 2017 and effective September 26, 2017, with Kodiak Capital Group, LLC (hereinafter referred to as "Kodiak" or the "Purchaser"). Under the Purchase Agreement, we have the right, but not the obligation, to sell shares of our common stock to Purchaser from time to time, in our sole discretion, for aggregate gross proceeds of up to $2,000,000.

> For each share of our common stock sold to Purchaser under the Purchase Agreement, the Purchaser will pay a purchase price equal to 80% of the Market Price. The Market Price is defined as the VWAP (Value Weighted Average Price) on the principal trading platform for the Common Stock, as reported by OTC Markets Group Inc., during the five consecutive Trading Days immediately preceding the date (the "Closing Request Date") that Kodiak receives a Put Notice from us (the "Valuation Period").
>
> ***On March 5, 2018, we effected an agreement with Kodiak, pursuant to which we put 2,308,460 shares to Kodiak for net proceeds of $925,000, or approximately $0.40 per share, and we put 739,645 shares to Kodiak for net proceeds of $75,000, or approximately $0.10 per share (referred to collectively as the "March Put").*** In consideration of, and as a condition to the March Put, Kodiak agreed: (i) to a "leak-out" provision, limiting the amount of shares Kodiak could sell in any given week to not more than the greater of (a) 500,000 shares per week and (b) six percent of the prior week's reported trading volume, proportionately adjusted for weeks with fewer than five trading days; (ii) that the number of shares Kodiak would be entitled to purchase under the terms of the Third Warrant are deemed reduced from 4,000,000 at $0.25 per share, to 2,100,000 at $0.25 per share; (iii) that the Commitment Note in the principal amount of $100,000 is deemed null and void and our payment obligations thereunder are effectively terminated; (iv) that our obligations under the terms of the Purchase Agreement and the Registration Rights Agreement are deemed satisfied; and (v) that the restrictions concerning third-party financings are terminated. In addition, we confirmed that we will not effectuate any further puts to Kodiak under the Purchase Agreement.

(Emphasis added).

57. Defendants' false and misleading statements during the Class Period artificially inflated the market price for Verb's common stock, and thus, the Purchase Price for the Put. Absent this artificial inflation, the Purchase Price would have been lower, forcing the Company to put substantially more shares to Kodiak in March 2018 in order to raise the same $1 million in cash proceeds. Therefore, by artificially inflating the market price of Verb common stock, Defendants were able to raise critical cash for operations while avoiding materially greater dilution of the Company's outstanding shares.

**<u>After Raising Millions from Investors, The Company Finally Discloses the Oracle Agreement in Full</u>**

58. Prior to April 23, 2018, Defendants had not disclosed the full text or terms of the Oracle Agreement in any form.

59. On April 23, 2018, Verb filed with the SEC a Current Report on Form 8-K ("April 23 8-K") that Cutaia signed in which they disclosed the entire Oracle Agreement. The copy of the full Oracle Agreement that Defendants attached to the April 23 8-K, is attached to this complaint as Exhibit B.

60. The Oracle Agreement was titled, "SuiteCloud Developer Network Agreement." Nowhere does the Oracle Agreement actually mention notifiCRM by name. Rather, the Oracle Agreement is a form agreement for developers seeking to work with NetSuite and host their application on the SuiteApp network. In the agreement, "Partner Name" and "Partner Address" are filled in with the Company's information, but the Company's name is not otherwise mentioned.

61. The April 23, 2018 disclosure of the terms of the Oracle Agreement revealed that Defendants' representations as to the scope and nature of the relationship with Oracle were materially misleading. For example, the Oracle Agreement provided the following contractual terms:

4. Partner Program Requirements.

4.8. Development. Partner will develop and make commercially available at least one (1) Partner Application or Partner Connector within one (1) year from the Effective Date.

* * *

4.10. Inspection. Only Partner Applications or Partner Connectors authorized by Oracle may be made available to Customers. Oracle's authorization of a Partner Application or Partner Connector does not mean that Oracle has inspected or reviewed the Partner Application or Partner Connector. Oracle may inspect the Partner Application or Partner Connector, including the source code and documentation related thereto, at any time during the Term. If, during such inspection, Oracle determines that the Partner Application or the Partner Connector is in violation of this Agreement, including any security requirements, any Partner Program rules, or the Marketing Guidelines, or is otherwise unsatisfactory, Oracle may terminate this Agreement, require that Partner modify the Partner Application or Partner Connector, or suspend Partner's access to the Service until the violation or other issues are resolved.

* * *

5. Marketing.

5.1. Participation on SuiteApp.com. Within one (1) month from the commercial availability of Partner Application or Partner Connector or upon request from Oracle, Partner will provide marketing information about Partner, the Partner Application, or the Partner Connector ("Marketing Materials") to be posted on the SuiteApp.com area of the Oracle website, in the Partner Program newsletter, or in connection with any Oracle marketing activities. Partner grants to Oracle a non-exclusive, worldwide, fully-paid, royalty free license during the Term to use the Marketing Materials, including

> any of Partner's Marks, trade names, or other trademarks included therein, in connection with any Oracle marketing activities, and to list Partner as a Oracle partner wherever such lists may appear. Oracle reserves the right, in its sole discretion, to refuse to list the Partner Application or Partner Connector on SuiteApp.com or to remove or modify Marketing Material. For avoidance of doubt, only Partner Applications and Partner Connectors that have met the requirements of the Quality Program as set forth in Section 4.12 will be listed on SuiteApp.com.

62. The text of the Oracle Agreement revealed that Oracle had no obligation or intent, express or implied, to expend any effort or resources to jointly market or jointly develop notifiCRM, contradicting Defendants' statements.

63. Moreover, the text of the Oracle Agreement revealed the true nature of the relationship between Oracle and the Company: the Company had simply been provided with an application developer toolkit for its program to interface with NetSuite. The Oracle Agreement was nothing more than the standard form contract Oracle offered in connection with its NetSuite developer toolkit.

64. In short, the Oracle Agreement revealed that Defendants had materially overstated the extent of the Company's relationship with Oracle, and Oracle's obligations under the Oracle Agreement.

65. Nonetheless, the April 23 8-K assured investors that:

> A press release we approved announcing the [integration of the Company's product with Oracle's NetSuite] has been prepared but we have been advised that it is awaiting final review and approval by certain parties, including the Oracle NetSuite CEO, after which, subject to any changes, will be distributed to the news wires. We have requested that the review and approval process be expedited.

66. Following the April 23, 2018 disclosures, the Company's stock price fell $0.18 per share that same day, or approximately 7%. As investors awaited the joint press release from the Company and Oracle as promised in the April 23 8-K, the Company's stock price continued to fall, dropping an additional $0.51 on April 24, 2018, or 21%, and falling a total of $1.35, or 51%, by the week's end on April 27, 2018.

67. On April 30, 2018, before market open, Cutaia uploaded a video directed to investors to nFüsz's website.[4] In the video, Cutaia assured investors that the Company and Oracle would issue a joint press release concerning the Oracle Agreement "within days," and that he was only awaiting Oracle's approval. Cutaia also claimed that NetSuite's CEO "has decided he wants to review the press release himself and sign off on it." On this reassuring news, the Company's stock price briefly increased by $0.26, or 20%, at the close of trading on April 30, 2018.

68. Cutaia also stated in the April 30, 2018 video that the Oracle Agreement (and a similar deal with Marketo) are "big deals for us, big relationships, massive value creation for you [nFüsz investors] and us."

69. The Company and Oracle never issued a joint press release. As the market realized the purported joint press release was not forthcoming "within days," as promised, the Company's stock price resumed its freefall, dropping $0.46, or 30%, over the next two days, to close at $1.08 on May 2, 2018. All told, the Company's stock price fell $1.55 between April 23, 2018 and May 2, 2018, losing 59% of its value.

70. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and the other members of the Class have suffered significant losses and damages.

[4] *Available at*: https://nfusz.com/super/ajax/ajax2.php?mediaid=iWV4eA at 1:40-3:18 (last visited December 3, 2019).

**Additional Scienter Allegations: Defendants Used Accurate Language to Describe the "Similar" Marketo Agreement**

71. On February 12, 2018, prior to market open, the Company filed a Current Report on Form 8-K with the SEC ("February 12 8-K"), announcing that the Company had entered into an agreement with Marketo, Inc. ("Marketo" and "Marketo Agreement"). Cutaia signed the February 12 8-K. The February 12 8-K provided, in part, as follows:

> On February 9, 2018 we entered into an agreement with MARKETO, INC. ("Marketo") with an effective date of April 1, 2018, (the "Agreement"). Marketo describes itself as 'the leading Engagement Platform that empowers marketers to create lasting relationships and grow revenue. Consistently recognized as the industry's innovation pioneer, Marketo is the trusted platform for thousands of CMOs thanks to its scalability, reliability, and openness. Marketo is headquartered in San Mateo, CA, with offices around the world, and serves as a strategic partner to large enterprise and fast-growing organizations across a wide variety of industries'.
>
> ***Pursuant to the Agreement, we will integrate our notifiCRM interactive video messaging technology ("notifiCRM") into the Marketo Engagement Platform***, in accordance with, and pursuant to, the 'ACCELERATE Partners Program' under Marketo's 'The LaunchPoint Technology Partner Program' (collectively, the "Partner Program"). ***The Agreement provides, among other things, that in accordance with the terms of the Partner Program, Marketo Account Executives, Marketo Customer Service Managers, and Marketo Solution Consultants will be incentivized by Marketo to sell notifiCRM to existing and prospective Marketo customers.***
>
> Once integration of notifiCRM into the Marketo Engagement Platform is complete, all Marketo customers

> (existing and future) that pay an additional per user fee (discussed below), will have the ability to create, edit, send, and track notifiCRM interactive video messaging seamlessly through the Marketo Engagement Platform.
>
> The Agreement is for an initial term of one year, but renews automatically for successive one-year terms, unless sooner terminated in accordance with the termination provisions set forth in the Agreement.
>
> Pricing is yet to be finalized, but it is estimated that the integrated notifiCRM feature set will be offered at a minimum floor price of not less than $5,000 (or such higher price, depending upon the requested features and functionality) per enterprise user, per quarter, (the "notifiCRM Fee") which is in addition to the price each such user pays for the Marketo Engagement Platform. The Agreement provides that the notifiCRM Fee will be shared between us and Marketo as follows: 80% to us and 20% to Marketo.
>
> The Agreement contains covenants, representations and warranties of us and Marketo that are typical for agreements of this type, including, among other things, provisions for confidentiality, intellectual property, and the licensed use of each other's trademarks for marketing purposes. The Agreement is non-exclusive. It is currently contemplated that once the application is available to be marketed to Marketo customers, the parties will prepare and distribute a joint press release.

(Emphasis added).

72. On February 12, 2018, the Company's stock price rose $0.05, or 20%, and its daily trading volume increased 588% over the previous day. This mirrored the market's reaction immediately following the Company's announcement of the Oracle Agreement, because as described in the Company's 2017 10-K, the Oracle Agreement and the Marketo Agreement provided important avenues for distribution

of notifiCRM to a much wider audience base than the Company could reach through its own direct retail distribution channels.

73. The Company did not disclose the full text of the Marketo Agreement with the February 12 8-K. Defendants disclosed the Marketo Agreement in full for the first time on August 14, 2018, as an attachment to the Company's Registration Statement filed with the SEC on Form S-1. The full Marketo Agreement showed that Cutaia signed the Marketo Agreement on February 9, 2018, and Marketo counter-signed on the same day.

74. In the Company's 2017 10-K, the Company pointed to the Oracle Agreement and the Marketo Agreement as key distribution methods for its notifiCRM product. The 2017 10-K described the Marketo Agreement as "a similar agreement" to the Oracle Agreement.

75. Notably, however, in the February 12 8-K, the Company did ***not*** claim that Marketo would jointly develop or jointly market the Company's product. Instead, the Company stated that "***we will integrate***" notifiCRM into Marketo's platform, and that Marketo's employees "***will be incentivized by Marketo*** to sell notifiCRM to existing and prospective Marketo customers."

76. Under both the Oracle Agreement and the Marketo Agreement, the Company bore sole responsibility for developing its notifiCRM application for the respective platforms, and Marketo/Oracle had the ***option and incentives*** (in the form of simple commissions), but ***no obligation***, to help market the Company's notifiCRM application. The fact that Defendants used much more accurate and precise language to describe the Marketo Agreement underscores that they knowingly, or at least recklessly, described the Oracle Agreement in a false and misleading manner in the January 3 8-K.

## NO SAFE HARBOR

77. The statutory safe harbor provided for certain forward-looking statements does not apply to any of the false statements alleged herein. None of the statements alleged herein is a "forward-looking statement" and no such statement was identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any forward-looking statements.

78. In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein that is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because, at the time each such statement was made: (i) the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statement was materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading; and/or (ii) each such statement was authorized and/or approved by a director and/or executive officer of the Company who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made.

79. None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

80. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Verb securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants and their families, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

81. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Verb had millions of shares of stock issued and outstanding and the Company's shares were actively traded on OTC. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class, and that they are geographically dispersed. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

82. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether the Defendants' acts as alleged violated the Exchange Act;

b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

c) whether Cutaia caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

d) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

e) whether the price of the Company's securities was artificially inflated during the Class Period as a result of the material misrepresentations complained of herein; and

f) whether the members of the Class have sustained damages as a result of the decline in value of Verb's securities when the truth was revealed and, if so, what is the proper measure of damages.

83. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

84. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the other members of the Class.

85. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

86. Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations pursuant to the fraud-on-the-market doctrine because the Company's common stock traded in an efficient market during the Class Period, in that, among other things:

(a) Defendants made public misrepresentations of material facts during the Class Period;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC;

(c) The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of Current Reports in their SEC filings;

(d) the Company's securities were liquid and traded with moderate to heavy volume during the Class Period. On average, nearly 600,000 shares of the Company's common stock, or approximately 7% of the Company's total shares outstanding, were traded weekly, permitting a very strong presumption that its shares traded on an efficient market; and

(e) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

87. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## **CLAIMS FOR RELIEF**

## **COUNT I**

### **Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

88. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

89. This Count, asserted against all Defendants, is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

90. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and/or misleading statements specified above, which they knew or deliberately disregarded were false and/or misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

91. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

92. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Verb were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Verb, their control over and/or receipt of and/or modification of Verb's allegedly materially false and misleading statements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning Verb, participated in the fraudulent scheme alleged herein.

93. Defendant Cutaia, who is a senior officer and director of the Company, acted with reckless disregard for the truth when he failed to disclose the true facts in the statements made by him and the Company to members of the investing public, including Plaintiffs and the Class.

94. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. Unaware of the falsity of

the Defendants' statements, Plaintiffs and the other members of the Class relied on the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

95. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

96. By reason of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for the substantial damages they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

## Violation of Section 20(a) of the Exchange Act Against Defendant Cutaia

97. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

98. During the Class Period, Cutaia participated in the operation and management of the Company and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.

99. As a result of his position of control and authority as a senior officer and director of the Company, Cutaia was able to, and did, control the contents of the various reports, press releases, and public filings that the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, Cutaia exercised his power and authority to cause Company to engage in the wrongful acts complained of herein. Therefore, Cutaia was a "controlling person" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged herein, which artificially inflated the market price of the Company's securities during the Class Period.

100. By reason of the above conduct, Cutaia is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Verb.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A. Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiffs as class representatives and Plaintiffs' counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all of the Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: December 3, 2019

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen

Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Joshua Baker (*pro hac vice*)
Jacob A. Goldberg (*pro hac vice*)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jbaker@rosenlegal.com
jgoldberg@rosenlegal.com

*Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Jacob A. Goldberg, hereby declare under penalty of perjury as follows:

I am the managing attorney of The Rosen Law Firm, P.A., with offices at101 Greenwood Avenue, Suite 440, Jenkintown, PA 19046. I am over the age of eighteen.

On December 3, 2019, I electronically filed the following **CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on December 3, 2019.

/s/ Jacob A. Goldberg
Jacob A. Goldberg