Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT C. HARTMANN, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>VERB TECHNOLOGY COMPANY, INC. and RORY J. CUTAIA,<br><br>    Defendants. | No: 2:19-cv-05896-GW-MAA<br><br>CLASS ACTION<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>JUDGE: Hon. George H. Wu<br>DATE: May 28, 2020<br>TIME: 8:30 a.m.<br>CTRM: 9D |

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    STATEMENT OF FACTS ....................................................................................3

    A.    Verb Relied on Investor Financing to Fund its Operations ..................3

    B.    Defendants Tout the Oracle Agreement as a "Game Changer"............4

    C.    The Company Raises Millions During the Class Period.......................6

    D.    The Company Discloses the Actual Oracle Agreement.......................7

III.   ARGUMENT.........................................................................................................9

    A.    Defendants' Mischaracterizations of the Oracle Agreement were Materially False ........................................................................................9

        1.    Defendants Made False and Misleading Statements About the Oracle Agreement's Joint Development Provisions...........10

        2.    Defendants Made False and Misleading Statements About the Oracle Agreement's Joint Marketing Provisions................10

        3.    The PSLRA Safe Harbor Does Not Shield Defendants...........14

    B.    The Complaint Adequately Alleges Scienter .....................................16

        1.    Defendants Knew or Recklessly Disregarded Facts Contradicting Their Statements About the Oracle Agreement..............................................................................16

        2.    The Complaint Alleges Additional Facts Supporting a Strong Inference of Scienter ....................................................18

            i.    Defendants' Motive to Raise Critical Operating Capital Supports a Strong Inference of Scienter ...........19

            ii.    Defendants' Description of the Marketo Agreement Supports a Strong Inference of Scienter........................21

            iii.    Cutaia's Lack of Stock Sales Do Not Negate an Inference of Scienter..................................................22

- i -

C.    The Complaint Adequately Alleges Control Person Claims Under Section 20(a)............................................................................23

IV.    CONCLUSION..................................................................................24

- ii -

# TABLE OF AUTHORITIES

**Cases**

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
   842 F. Supp. 2d 1216 (C.D. Cal. 2012) ....................................................................9

*Anderson v. Peregrine Pharm., Inc.*,
   654 F. App'x 281 (9th Cir. 2016).............................................................................20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................................12

*Ass'n for Los Angeles Deputy Sheriffs v. Cty. of Los Angeles*,
   648 F.3d 986 (9th Cir. 2011) ....................................................................................9

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) .......................................................................12, 15, 17

*Cedano-Viera v. Ashcroft*,
   324 F.3d 1062 (9th Cir. 2003) ................................................................................11

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005).................................................................................................10

*Gammel v. Hewlett-Packard Co.*,
   No. SACV 11-1404 AG RNBX, 2013 WL 1947525 (C.D. Cal. May 8, 2013)...19

*Hsu v. Puma Biotechnology, Inc.*,
   213 F. Supp. 3d 1275 (C.D. Cal. 2016) ..................................................................18

*In re Amgen Inc. Sec. Litig.*,
   544 F. Supp. 2d 1009 (C.D. Cal. 2008) ..................................................................24

*In re Aspeon, Inc. Sec. Litig.*,
   168 F. App'x 836 (9th Cir. 2006)............................................................................23

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
   932 F. Supp. 2d 1095 (C.D. Cal. 2013) ..................................................................12

*In re Downey Sec. Litig.*,
   No. CV 08-3261-JFW(RZX), 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009).....23

*In re Entropin, Inc. Sec. Litig.*,
487 F. Supp. 2d 1141 (C.D. Cal. 2007) ....................................................23

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005)......................................................18

*In re K-tel Int'l, Inc. Sec. Litig.*,
107 F. Supp. 2d 994 (D. Minn. 2000)......................................................23

*In re Portal Software, Inc. Sec. Litig.*,
No. C-03-5138 VRW, 2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) ...............20

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ..............................................................15

*In re Questcor Sec. Litig..*, No. SA CV 12-01623 DMG,
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013).........................................19

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ..........................................................20, 23

*In re Synergen, Inc. Sec. Litig.*,
863 F. Supp. 1409 (D. Colo. 1994)...................................................20, 21

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993)...................................................................22

*Jackson v. Carey*,
353 F.3d 750 (9th Cir. 2003) ...............................................................25

*Kane v. Madge Networks N.V.*,
No. C-96-20652-RMW, 2000 WL 33208116 (N.D. Cal. May 26, 2000)...........22

*Kennis v. Metro. W. Asset Mgmt., LLC*,
No. CV 15-8162-GW(FFMX), 2016 WL 11507086 (C.D. Cal. Apr. 25, 2016).13, 24

*Kyung Cho v. UCBH Holdings, Inc.*,
890 F. Supp. 2d 1190 (N.D. Cal. 2012) ................................................24

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ............................................................20

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS; 2:19-cv-05896-GW-MAA

*Maiman v. Talbott*,
No. SACV090012AGANX, 2010 WL 11421950 (C.D. Cal. Aug. 9, 2010) .......17

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ................................................................................10, 17, 19

*McNichols v. Colvin*,
No. EDCV 15-0262-KK, 2016 WL 7167909 (C.D. Cal. Dec. 8, 2016)...............18

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ................................................................10, 13

*Mulligan v. Impax Labs., Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................15

*Nguyen v. Radient Pharm. Corp.*,
No. SACV110406DOCMLGX, 2011 WL 13141630 (C.D. Cal. Oct. 26, 2011).20

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ...................................................................passim

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ..............................................................16

*Ramirez v. Exxon Mobil Corp.*,
334 F. Supp. 3d 832 (N.D. Tex. 2018) ................................................................20

*Reese v. BP Expl. (Alaska) Inc.*,
643 F.3d 681 (9th Cir. 2011) ..............................................................10

*S.E.C. v. Todd*,
642 F.3d 1207 (9th Cir. 2011) ................................................................24, 25

*Sisseton-Wahpeton Sioux Tribe of Lake Traverse Indian Reservation, N. Dakota & S. Dakota v. United States*,
90 F.3d 351 (9th Cir. 1996) ................................................................25

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ..............................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..............................................................................9, 17, 19

- v -

*U.S. ex rel. Giles v. Sardie*,
   191 F. Supp. 2d 1117 (C.D. Cal. 2000) ..................................................................11

*Upton v. Tribilcock*,
   91 U.S. 45 (1875) .....................................................................................................18

*Vernazza v. S.E.C.*,
   327 F.3d 851 (9th Cir. 2003) ...................................................................................19

*Wallace v. Chafee*,
   451 F.2d 1374 (9th Cir. 1971) ................................................................................18

*West v. Innotrac Corp.*,
   No. 3:05-CV-0394-ECR-RAM, 2005 WL 8162181 (D. Nev. Dec. 27, 2005) ....22

**Statutes**

15 U.S.C. § 78t(a) ...........................................................................................................24

15 U.S.C. § 78u-4(b)(2) ..................................................................................................17

15 U.S.C. § 78u-5............................................................................................................15

15 U.S.C. § 78u-5(c)(1)(A)(i) .........................................................................................16

15 U.S.C. § 78u-5(c)(2) ..................................................................................................16

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 2:19-cv-05896-GW-MAA

Lead Plaintiff J. Leister and named plaintiff Alexander Wolfson ("Plaintiffs") respectfully submit this memorandum of points and authorities in opposition to the motion to dismiss filed by Defendants Verb Technology Company, Inc. ("Verb" or "Company") and Rory J. Cutaia ("Cutaia").

## I.    INTRODUCTION

On April 23, 2018, Defendants disclosed via SEC filing the full agreement ("Oracle Agreement") between development-stage Verb and information technology colossus Oracle America, Inc. ("Oracle"). By its actual terms, the Oracle Agreement was materially inconsistent with Defendants' January 3, 2018 announcement describing the Oracle Agreement, purportedly to develop and to market *jointly with Oracle* Verb's interactive video technology, notifiCRM. In truth, rather than a joint development and joint marketing agreement as Defendants falsely portrayed it, the Oracle Agreement was Oracle's form contract for developers of applications for Oracle's NetSuite platform, granting access to Oracle's application developer toolkit. In the wake of Defendants' materially misleading, January 2018 disclosure about the Oracle Agreement, Verb raised more than $2.3 million in critical financing from selling its stock. When Defendants belatedly disclosed the truth, the Verb's stock price fell materially, causing Plaintiffs and members of the Class to suffer damages.

At the end of 2017, the Company, a small start-up technology company, claimed to have developed customer relationship management ("CRM") software involving interactive video features designed to help companies' sales and marketing personnel. The Company had no appreciable sales, no present ability to generate revenue, and faced a substantial working capital deficit. As the Company openly admitted in its public filings, it depended entirely on investor capital to fund its continuing operations as it tried to develop its technology and future revenue streams.

On December 27, 2017, the Company entered into the Oracle Agreement to integrate the Company's notifiCRM application into Oracle's multi-billion-dollar

- 1 -

NetSuite application network. Defendant Cutaia, himself, signed the Oracle Agreement. In a Current Report on Form 8-K that Cutaia signed and that Verb filed with the SEC on January 3, 2018 ("January 3 8-K"), the Company announced the Oracle Agreement, describing the Oracle Agreement's purported provisions but not attaching a copy of the full Oracle Agreement. Oracle, Defendants boasted, had agreed to jointly develop and jointly market the notifiCRM application. In online videos to investors, Cutaia repeated this characterization and referred investors directly to the January 3 8-K. On the back of this self-described "game changer" of an announcement, the Company raised millions in direly needed capital by selling its stock to investors.

In a Current Report on Form 8-K that Cutaia signed and that Verb filed with the SEC on April 23, 2018 ("April 23 8-K"), Defendants disclosed the truth about the Oracle Agreement, attaching a copy to the 8-K. Contrary to their representations, the Oracle Agreement, on its face, did not provide for Oracle to jointly develop or jointly market notifiCRM. In fact, the April filing revealed that the vaunted Oracle Agreement was merely a standard form contract for developers seeking to interface with Oracle's NetSuite platform.

In their motion to dismiss, Defendants assert that the Complaint fails to plead falsity or scienter with requisite particularity. Defendants, however, concede that their statements about Oracle jointly developing the application with the Company were false. Defendants' statements about Oracle jointly marketing the application state, or at least misleadingly imply, that joint marketing efforts were an obligatory term of the Oracle Agreement. The Oracle Agreement contained no such provisions. Knowing or recklessly disregarding the actual terms of the Oracle Agreement, Defendants lied about it. The Complaint pleads with requisite particularity that Defendants knowingly or recklessly misrepresent the terms of the Oracle Agreement

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS; 2:19-cv-05896-GW-MAA

to raise critical operating cash. For the following reasons, therefore, this Court should deny Defendants' motion to dismiss in its entirety.

## II.   STATEMENT OF FACTS

### A.   Verb Relied on Investor Financing to Fund its Operations

At all relevant times, including throughout the Class Period, Verb was known as nFüsz, Inc. ("nFüsz ").[1] ¶20.[2] nFüsz was a development stage software company with seven total full-time employees. *Id*. The Company purported to sell subscriptions to cloud-based business software including notifiCRM, which was CRM software that uses interactive video features to help sales and marketing personnel communicate with their clients and prospective clients. *Id*. According to the Company, subscribers use notifiCRM to embed active links in videos, which clients or prospective clients can use to as direct links to purchase or to contact the subscribing company in real time. ¶22.

As a start-up technology company, nFüsz relied on infusions of cash from outside investors to fund its continuing operations. As the Company disclosed in an S-1 Registration Statement filed with the SEC in October 2017 ("October 2017 S-1"), "[t]o date, we have not derived any revenues from our operations and have incurred losses since inception." ¶23. The Company explained in the October 2017 S-1 that "we expect that we will need to obtain substantial additional funding in order to continue our operations." ¶24.

On April 2, 2018, the Company filed its 2017 annual report on Form 10-K with the SEC ("2017 10-K"). ¶26. In the 2017 10-K, the Company revealed that as of December 31, 2017, the Company had only $10,560 in cash and a working capital deficit of nearly $6 million. *Id*. The Company reported in the 2017 10-K that it had

---

[1] The Company changed its corporate name to Verb Technology Company, Inc. on February 1, 2019.

[2] References to "¶__" are to paragraphs of Plaintiffs' Consolidated Amended Complaint for Violations of the Federal Securities Laws, Dkt. No. 51 ("Complaint").

net sales of less than $6,000 for the entire year, and it incurred a net loss from operations of nearly $5 million. *Id.* The Company estimated that its operating expenses for 2018 would continue to outpace its revenues, requiring the Company to raise capital through debt or equity offerings to continue operations. ¶27.

The 2017 10-K reiterated the warnings from the October 2017 S-1. ¶28. These warnings included that: (1) the Company's auditors issued a "going concern" audit opinion, expressing doubt about the Company's ability to continue as a going concern; (2) the Company's lack of revenues required it to raise additional capital to continue operating; (3) the Company had financed its operations entirely through equity and debt investments, and expected it would continue to do so; (4) if the Company was unable to procure adequate capital, the Company's ability to grow and compete would be adversely affected; and (5) the Company's failure to raise sufficient capital could force it to delay, reduce, or eliminate operations, including notifiCRM commercialization efforts. *Id.* Thus, at the beginning of 2018, with no cash or revenue-generating capabilities sufficient to support itself as a going concern, the Company needed to obtain critical operating cash from investors.

**B.    Defendants Tout the Oracle Agreement as a "Game Changer"**

On January 3, 2018, before markets opened, the Company filed with the SEC the January 3 8-K, disclosing that the Company and business software giant Oracle had just executed a joint development and joint marketing agreement with respect to an application "to facilitate integration of [the Company's] notifiCRM interactive video messaging technology into [Oracle's] NetSuite Software-as-a-Service platform." ¶35. Cutaia signed the January 3 8-K. Cutaia touted the Oracle Agreement as a "game changer," and a "big deal[] for us, big relationship[], massive value creation for you [Verb investors] and us," in online videos directed at investors. ¶3.

In early 2018, Oracle was (and remains today) a massive software company, with billions of dollars in annual revenues and over one hundred thousand employees,

- 4 -

including nearly 40,000 employees in its sales and marketing functions. ¶¶30-31. Oracle also owned NetSuite, Inc. ("NetSuite"), a leading provider of cloud-based enterprise resource planning software and related applications, which generated billions of dollars in annual revenues from its CRM software. ¶¶32-33. NetSuite's SuiteApp marketplace served as a platform for hundreds of SuiteCloud Development Network ("SDN") partners, each offering various software extensions and plugins for NetSuite. ¶34. Potential SDN partners could apply on the NetSuite website to develop an application to integrate their software into the NetSuite platform. *Id.*

In describing the Oracle Agreement, the January 3 8-K flaunted that:

> ***The Agreement provides that the development of the application, which will be undertaken jointly by us and ORACLE, will be completed within one year.*** We anticipate that development of the application, which has already begun, will be completed within 120 days. The Agreement is for an initial term of one year, but renews automatically for successive one-year terms, unless sooner terminated in accordance with the termination provisions set forth in the Agreement.
>
> Upon completion of development and testing of the application, ***it will be marketed jointly by us and ORACLE***, through, among other things, ORACLE'S existing network of approximately 2,000 ORACLE NetSuite sales reps.

¶35 (emphasis added). These statements were false and misleading because, as explained more fully below, Defendants knew or should have known that the Oracle Agreement did not provide that Oracle would jointly develop or jointly market the Company's notifiCRM application, and Oracle had expressed no intent in the Oracle Agreement to do so. ¶36.

Crucially, however, although the Company purported to incorporate the Oracle Agreement by reference into the January 3 8-K, the Company did not include a copy of the Oracle Agreement with its filing, or with any other filing during the Class

- 5 -

Period. ¶58. In response to this announcement, the Company's stock price climbed 30% that same day on unusually high trading volume. ¶37.

Throughout the Class Period, Defendants continued to tout their lies about the Oracle Agreement. On February 23, 2018, before markets opened, Cutaia provided a video update to investors regarding the Oracle Agreement. ¶38. In this video, Cutaia stated that Oracle's NetSuite salesforce of 2,000 employees will sell the Company's notifiCRM technology to NetSuite customers as an upgrade to NetSuite. ¶¶38-39. Cutaia also referred investors to the January 3 8-K announcing the Oracle Agreement. These statements created the false and misleading impression that the Oracle Agreement obligated Oracle to use its sales force to jointly market the Company's notifiCRM application. ¶40. After this video was posted, the Company's stock price climbed another 20% that same day. ¶41.

Finally, on March 1, 2018, Cutaia provided another video update to investors which once again highlighted the supposed terms of the Oracle Agreement. ¶42. Speaking about the Oracle Agreement and directing investors to access and download the January 3 8-K, Cutaia stated that: "They [Oracle] have got millions of current subscribers and a sales force of over 2,000 people who will market our product as an upgrade feature to all of those customers." *Id*. These statements created the false and misleading impression that the Oracle Agreement obligated Oracle to use its sales force to jointly market the Company's notifiCRM application. ¶43.

**C.    The Company Raises Millions During the Class Period**

Defendants' false and misleading statements about the Oracle Agreement artificially inflated the Company's stock price during the Class Period. This helped Defendants raise millions in critical capital through selling the Company's common stock at higher prices than they could have sold it for, absent the misrepresentations.

In the Company's quarterly report for the first quarter of 2018, filed with the SEC on Form 10-Q ("Q1'18 10-Q"), the Company revealed that as of March 31, 2018

- 6 -

the Company had approximately $1.6 million in cash – or approximately $1.6 million more than the Company had just three days before the January 3 8-K. ¶45. As the Company explained in the Q1'18 10-Q, the Company raised $2.3 million in cash from selling its stock during the quarter. *Id.* That was over six times as much as the Company was able to raise in the first quarter of 2017. ¶46. The Company reported that its net sales for the quarter were still negligible, resulting in a net loss from operations of over $5 million. ¶47. In the Company's quarterly report for the second quarter of 2018, filed with the SEC on Form 10-Q, the Company revealed that it raised an additional $700,000 from stock sales during the second quarter of 2018. ¶48. The Company's net sales for the quarter remained close to nil. ¶49.

The Company also had in place a Purchase Agreement with Kodiak Capital Group, LLC ("Kodiak") from 2017, under which the Company had the right to raise up to $2 million in cash from Kodiak by putting shares to Kodiak ("Put"). ¶¶50-52. Under the terms of the Put, the number of shares the Company was required to put to Kodiak to raise those funds would depend on the market price of the Company's stock – the higher the stock price, the fewer shares the Company was required to put to Kodiak. ¶53. The Company exercised the Put to raise $1 million on March 5, 2018, during the Class Period. ¶56. This allowed Defendants to take advantage of its artificially inflated stock price to raise critical capital for a materially lower cost of shares put to Kodiak, avoiding materially greater dilution of the Company's outstanding shares. ¶57.

**D.     The Company Discloses the Actual Oracle Agreement**

Defendants finally published the entire Oracle Agreement as an exhibit to the April 23 8-K. ¶59.[3] Cutaia signed the Oracle Agreement on December 27, 2017, and Oracle signed it on January 2, 2018. ¶29. Rather than an agreement among Oracle

---

[3] A copy of the Oracle Agreement, as attached to the April 23 8-K, is attached to the Complaint as Exhibit B.

and Verb to jointly develop and jointly market the notifiCRM application, the Oracle Agreement was a contract of adhesion—Oracle's standard form contract for application developers seeking to work with NetSuite. It did not even mention notifiCRM by name. ¶60.

Moreover, the Company's full disclosure of the Oracle Agreement revealed that Oracle neither assumed an obligation nor expressed its intention to jointly market or jointly develop notifiCRM. ¶¶61-62. The Oracle Agreement actually provided that (1) *the Company* would develop the notifiCRM application and make it available to NetSuite within one year; (2) Oracle had the *right*, but not the *obligation* to review the notifiCRM application and to authorize it to be made available to NetSuite customers; (3) the Company must provide to Oracle marketing information about the notifiCRM application and the Company's trademark rights, which Oracle *could*, at Oracle's discretion, use in its marketing activities; and (4) Oracle maintained sole discretion to refuse to list the notifiCRM application on its website or in its marketing materials. ¶61; Complaint, Ex. B. In sum, the Oracle Agreement was a form application developer contract, *allowing* but not *obligating* Oracle to market the notifiCRM application that the Company, alone, was developing.

In addition to finally disclosing a copy of the full Oracle Agreement, the April 23 8-K also assured investors that a joint press release announcing the integration of the notifiCRM application with NetSuite was prepared and awaiting final review and approval by Oracle, and that its release was imminent. ¶65.

Immediately following the April 23 8-K, the Company's stock price fell approximately 7%. ¶66. As investors awaited the joint press release promised in the April 23 8-K, the Company's stock price continued to fade, falling a total of $1.35, or 51%, by week's end. *Id.* The Company's stock price briefly increased by 20% upon Cutaia's posting of an video assuring investors that the joint press release would issue "within days," as soon as Oracle approved it. ¶67. However, the Company never

- 8 -

released the joint press release, and the Company's stock price resumed its freefall, dropping 30% over the next two days, losing a total of 59% of its value from April 23, 2018.

## III. ARGUMENT

On motion to dismiss, "courts must … accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).[4] "A court reads the complaint as a whole, together with matters appropriate for judicial notice, rather than isolating allegations and taking them out of context." *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1223 (C.D. Cal. 2012) (*citing Tellabs, Inc.*, 551 U.S. 308). The Court reads the Complaint in light of all reasonable inferences supporting a plausible claim entitling Plaintiffs to relief. *Ass'n for Los Angeles Deputy Sheriffs v. Cty. of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011). "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

Defendants challenge the adequacy of only the Complaint's allegations of falsity and scienter. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005) (the elements of a Rule 10b-5 claim are falsity, materiality, scienter, reliance, loss causation and damages). For the following reasons, their challenge fails.

### A. Defendants' Mischaracterizations of the Oracle Agreement were Materially False

Statements of material fact are actionable in the securities fraud context if they are either false or misleading. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36 (2011). "A statement or omission is misleading in the securities fraud context if it would give a reasonable investor the impression of a state of affairs that differs

---

[4] Emphasis is added and internal citations and quotations are omitted unless otherwise noted.

- 9 -

in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011). Even literally true statements may mislead, due to their context and manner of presentation. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).

### 1.   Defendants Made False and Misleading Statements About the Oracle Agreement's Joint Development Provisions

Defendants do not contest that their statement that Oracle would jointly develop the notifiCRM application was false.[5] *See* Def. Br. at 7.[6] Indeed, no such argument could stand. The January 3 8-K stated that the Oracle Agreement "provides that the development of the [notifiCRM] application, ***which will be undertaken jointly by us and ORACLE***, will be completed within one year." ¶35. The Oracle Agreement contains no such provision. Instead, the Oracle Agreement provides that *the Company*—and not Oracle—would develop the notifiCRM application, making it available to Oracle within one year. ¶61; Complaint, Ex. B. Thus, Defendants' statement about joint development was false.

### 2.   Defendants Made False and Misleading Statements About the Oracle Agreement's Joint Marketing Provisions

The January 3 8-K also stated that "[u]pon completion of development and testing of the [notifiCRM] application, ***it will be marketed jointly by us and ORACLE***, through, among other things, ORACLE'S existing network of approximately 2,000 ORACLE NetSuite sales reps." ¶35. This statement was false and misleading because it states, or at least strongly implies, that the Oracle

---

[5] Defendants may not challenge the falsity of this statement in their reply brief. "It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers." *U.S. ex rel. Giles v. Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000); *see also Cedano-Viera v. Ashcroft*, 324 F.3d 1062, 1066 n.5 (9th Cir. 2003) ("[W]e decline to consider new issues raised for the first time in a reply brief").

[6] References to "Def. Br." are to Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss, Dkt. No. 55-1.

- 10 -

Agreement provides that Oracle and the Company would jointly market the notifiCRM application through Oracle's network of thousands of NetSuite sales representatives. The Oracle Agreement did not provide that Oracle would jointly market the notifiCRM application, nor did it provide that Oracle would use its NetSuite sales force to do so. Rather, the Oracle Agreement required *the Company* to provide marketing materials and trademark licenses to Oracle, but it did not obligate *Oracle* to expend any efforts to market the notifiCRM application—on its own or in concert with the Company. ¶61; Complaint, Ex. B.

False and misleading statements concerning the provisions of an existing contract are actionable. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 990 (9th Cir. 2008) (finding alleged false statements concerning the company's contractual entitlements were actionable); *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 937 (9th Cir. 2003) (finding alleged false statements describing provisions of a past settlement agreement its present effects on the company were actionable).

Contrary to Defendants' contentions, Def. Br. at 7-8, the joint marketing statement in the January 3 8-K refers to the enforceable provisions of the Oracle Agreement, not to Defendants' expectations or predictions. Defendants' argument that "Defendants said that … the parties *anticipated* joint marketing," Def. Br. at 7 (emphasis added), is belied by both the plain language and context of the false statements. The joint marketing statement in the January 3 8-K did not describe actions which Oracle *could potentially*, or *was permitted to*, do. The word "anticipated" does not appear in the alleged false statement, and neither do any of its synonyms.[7]

---

[7] Defendants' argument that the fact that the Oracle Agreement lacked a joint marketing requirement "is *not necessarily* inconsistent with Defendants' statements," Def. Br. at 8 (emphasis added), concedes that Defendants' statements could plausibly

Furthermore, Defendants wrote the body of the January 3 8-K under the heading "Item 1.01. Entry into a Material Definitive Agreement." ¶35.[8] This indicates that the statements included under that heading refer to the agreement described therein. The joint marketing statement begins the third of five paragraphs under that heading. *Id.* The first paragraph announces that the Company and Oracle had entered into the Oracle Agreement. *Id.* The second paragraph begins with "[t]he Agreement provides," falsely describing the joint development provision, the term, and the termination provisions of the Oracle Agreement. *Id.* Then the joint marketing statement begins the very next paragraph, describing what "will" happen after the joint development purportedly provided for in the Oracle Agreement. *Id.* The last sentence of the third paragraph, as well as much of the fourth paragraph all describe other terms of the Oracle Agreement. *Id.*

Finally, the January 3 8-K employs the language of certainty to state that the notifiCRM application "***will be marketed jointly***" by the Company and Oracle. *Id.* The definite language describing what Oracle "will" do is most reasonably understood to refer to additional obligatory provisions of the Oracle Agreement. Thus, a reasonable investor reading the January 3 8-K would have understood that

---

be inconsistent with the Oracle Agreement. Plaintiffs are not required to allege that Defendants' statements were "necessarily" false, only that the Complaint "plausibly alleges that the Defendants made a false statement." *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 932 F. Supp. 2d 1095, 1107 (C.D. Cal. 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). As Defendants concede, the Court cannot find as a matter of law that Defendants' statements are not inconsistent with the Oracle Agreement.

[8] A copy of the January 3 8-K is attached in full as Exhibit A to the Declaration of Joshua Baker ("Baker Decl."). The Court may properly take judicial notice of the Company's SEC filings, including the January 3 8-K. *Kennis v. Metro. W. Asset Mgmt., LLC*, No. CV 15-8162-GW(FFMX), 2016 WL 11507086, at *3 (C.D. Cal. Apr. 25, 2016) (Wu, J.) ("Because the SEC filings … are matters of public record, the Court would take judicial notice of them").

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 2:19-cv-05896-GW-MAA

the joint marketing statement referred to the provisions of the Oracle Agreement. The joint marketing statement in the January 3 8-K was therefore at least misleading, even if it were not literally false. *Miller*, 519 F.3d at 886.

Similarly, Cutaia's online videos to investors stated or at least strongly implied that Oracle would jointly market the notifiCRM application pursuant to an enforceable provision of the Oracle Agreement. In each of Cutaia's February 23, 2018 and March 1, 2018 videos, he specifically referenced the Oracle Agreement and refers investors to the January 3 8-K. ¶¶39, 42. In the March 1, 2018 video, Cutaia even directed investors to download the January 3 8-K. ¶42. By incorporating the January 3 8-K by reference, Cutaia also incorporated the January 3 8-K's false and misleading joint marketing statement into his video comments about the same exact topic.

In the videos, Cutaia stated, again employing the language of certainty, that (1) Oracle's "2,000 sales people [] are going to go back to millions of customers" to help sell and market the notifiCRM application, ¶39 (February 23, 2018 video); and (2) "They [Oracle] have got millions of current subscribers and a sales force of over 2,000 people who will market our product as an upgrade feature to all of those customers," ¶42 (March 1, 2018 video). The misleading inference of Cutaia's statements was that the Oracle Agreement required Oracle to use its sales force to jointly market the notifiCRM application.

Defendants argue that it was "clear" that the joint marketing portion of the parties' "understanding" was not yet reduced in writing because the pricing at which the notifiCRM application would be offered on NetSuite was not yet finalized. Def. Br. at 7-8. This is a red herring. Defendants were not touting an "understanding" with Oracle in their public statements, or their "understanding" of Oracle's intent, they

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 2:19-cv-05896-GW-MAA

were describing the terms of a written, binding agreement.[9] That the final pricing was not yet established is irrelevant and unremarkable. The Company had still not completed its development of the application at the time of the Oracle Agreement, so it makes sense that a final price for the application was yet undetermined. Only by adding words and ignoring express ties to the Oracle Agreement can Defendants manufacture an interpretation of their false statements that is not "necessarily inconsistent" with the truth.

### 3.    The PSLRA Safe Harbor Does Not Shield Defendants

The safe harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-5, does not shield a defendant's descriptions of past or present events. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017); *No. 84 Employer-Teamster Joint Council Pension Trust Fund*, 320 F.3d at 936–37. "Nor is the safe harbor designed to protect [defendants] when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." *Quality Sys.*, 865 F.3d at 1142; *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 965 (N.D. Cal. 2014) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to that part of the statement that refers to the present.").

Where, as here, Defendants' statements concern the provisions of an existing contract, the statements are not forward-looking and not protected by the PSLRA safe harbor. *Berson*, 527 F.3d at 990 (finding alleged false statements were not forward-looking because they represented contractual provisions); *No. 84 Employer-Teamster*

---

[9] The Complaint also alleges that Oracle "had expressed no intent, to jointly market the application with the Company." ¶¶36, 43. Defendants misread this as a separate allegation of Oracle's intent, extrinsic to the Oracle Agreement. Def. Br. at 8. Read in proper context, this allegation means simply that Oracle had expressed no intent *in the Oracle Agreement* to jointly market the application. Even if Oracle did subjectively intend to jointly market the Company's application, Defendants' false statements concern the Oracle Agreement, not Oracle's intent.

- 14 -

*Joint Council*, 320 F.3d at 937 (finding alleged false statements were not forward-looking because they described provisions of a past settlement agreement its present effects on the company). Contrary to Defendants' assertions, Def. Br. at 9 n.5, the alleged false statements here describe a contract Defendants had already executed—past facts, not future events. Defendants' false statements concern the provisions contained in the Oracle Agreement, which was already signed when the Company issued its "Current Report" in the January 3 8-K. Defendants' statements that the notifiCRM application "will be marketed" jointly, and that Oracle's sales force "will market" the application, are not anticipatory statements of future events, but rather statements expressing certainty and implying that such actions were covenanted in the Oracle Agreement. Defendants' statements were not about whether Oracle would perform its obligations in the future, they were misrepresenting Oracle's purported obligations under the existing Oracle Agreement.

Additionally, even if the statements were forward-looking, none of them are protected under the PSLRA safe harbor provision because none of the false statements are accompanied "by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i);[10] *see also No. 84 Employer-Teamster Joint Council*, 320 F.3d at 937 ("even if we were to find them to be 'forward-looking,' neither statement is accompanied by the requisite 'meaningful cautionary statement.'"). Defendants do not contend otherwise. Def. Br. at 9 n.5.

Defendants' citation to *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058–60 (9th Cir. 2014), Def. Br. at 9 n.5, highlights the deficiency of their safe harbor assertion. That case dealt with "classic growth and revenue projections, which are forward looking on their face." *Id.* at 1058. The *Intuitive*

---

[10] Additional requirements, which were also not met, apply to oral statements such as Cutaia's videos to investors. 15 U.S.C. § 78u-5(c)(2).

- 15 -

*Surgical* defendants also accompanied their statements with appropriate cautionary language. *Id.* at 1059–60. In this case, by stark contrast, the statements at issue projected nothing. Rather, Defendants falsely described the terms of the Oracle Agreement, an actual contract that Verb and Oracle had already executed. Those terms existed before Defendants falsely portrayed them. As such, Defendants' statements were materially false and the PSLRA's safe harbor is inapplicable. *See Berson*, 527 F.3d at 990 (concrete facts like snapshots of work under contract at a given time are not projections of financial results or future operations and are not forward looking).

### B.    The Complaint Adequately Alleges Scienter

To adequately allege scienter, "Plaintiffs must 'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987 (quoting 15 U.S.C. § 78u-4(b)(2)). In *Tellabs*, 551 U.S. at 314, the Supreme Court held that scienter is adequately pled where the inference of fraud is cogent and at least *equally* as likely as any non-culpable explanation of the alleged conduct. "The Supreme Court has now made clear ... that a tie goes to the Plaintiff." *Maiman v. Talbott*, No. SACV090012AGANX, 2010 WL 11421950, at *5 (C.D. Cal. Aug. 9, 2010). In finding whether scienter is adequately alleged, the Court reviews "all the allegations holistically." *Matrixx*, 563 U.S. at 48 (citing *Tellabs*, 551 U.S. at 326).

### 1.    Defendants Knew or Recklessly Disregarded Facts Contradicting Their Statements About the Oracle Agreement

The Complaint adequately alleges scienter because Cutaia signed the Oracle Agreement before Defendants made false and misleading statements about it. Defendants do not contest that Cutaia's scienter is properly imputed to the Company. *C.f.* Def. Br. at 14 n.7. These allegations are stronger than those present in cases where

courts have found that plaintiffs adequately pleaded that defendants acted with at least "deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987 (allegations that the company's chief executives presumably knew or should have known about facts contradicting their statements were sufficient to support a finding of scienter); *see also No. 84 Employer-Teamster Joint Council*, 320 F.3d at 937 (allegations that the company's outside directors presumably knew or should have known about facts contradicting their statements were sufficient to support a finding of scienter).

Here, Cutaia signed the Oracle Agreement on behalf of the Company on December 27, 2017 – one week before the January 3 8-K. ¶29. Oracle countersigned on January 2, 2018. *Id.* At the pleadings stage, the Court presumes that Cutaia read the agreement that he signed. *See, e.g., McNichols v. Colvin*, No. EDCV 15-0262-KK, 2016 WL 7167909, at *3 (C.D. Cal. Dec. 8, 2016) (a party "is presumed to have known the contents of the agreement when he signed it") (citing *Wallace v. Chafee*, 451 F.2d 1374, 1377 (9th Cir. 1971) ("One who enters a contract is on notice of the provisions of the contract."))[11] Plaintiffs' allegation that Cutaia signed, and presumably read, the Oracle Agreement prior to Defendants' false statements about the Oracle Agreement is sufficient to support a strong inference of scienter.

Defendants' argument that the Complaint fails to allege scienter because it "does not have a single direct allegation of fact about Mr. Cutaia's belief, understanding, or state of mind," or "allegations showing that Mr. Cutaia did *not*, in fact, honestly believe his statements," is both patently false and beside the point. The Complaint alleges that Cutaia signed the Oracle Agreement before Defendants made

---

[11] *See also Upton v. Tribilcock*, 91 U.S. 45, 50 (1875) ("It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law.").

- 17 -

false and misleading statements about it. "[T]hat the defendants published statements when they knew facts suggesting the statements were inaccurate … is classic evidence of scienter." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005); *see also Hsu v. Puma Biotechnology, Inc.*, 213 F. Supp. 3d 1275 (C.D. Cal. 2016) ("the most direct way to show both that a statement was false when made and that the party making the statement knew it was false is via contemporaneous reports or data, available to the party, which contradict the statement").

Moreover, evidence of Cutaia's subjective intent to defraud is irrelevant. "In this Circuit, a violation of Exchange Act § 10(b) and Rule 10b–5 may be supported by knowing or reckless conduct, without a showing of willful intent to defraud." *Vernazza v. S.E.C.*, 327 F.3d 851, 860 (9th Cir. 2003). The Complaint alleges that Cutaia and the Company acted with at least deliberate recklessness, which is sufficient to adequately allege scienter.

### 2.    The Complaint Alleges Additional Facts Supporting a Strong Inference of Scienter

As the Supreme Court has held, "[t]he absence of a motive allegation, though relevant, is not dispositive." *Matrixx*, 563 U.S. at 48 (citing *Tellabs*, 551 U.S. at 325); *Gammel v. Hewlett-Packard Co.*, No. SACV 11-1404 AG RNBX, 2013 WL 1947525, at *21 (C.D. Cal. May 8, 2013) (similar, finding that "Plaintiffs' accumulated allegations adequately support scienter"). Nonetheless, in addition to alleging facts directly demonstrating Defendants' actual knowledge or deliberate recklessness, the Complaint alleges facts sufficient to show Defendants' motive and opportunity to commit securities fraud. These allegations further strengthen Plaintiffs' allegations that Defendants acted with scienter. *See In re Questcor Sec. Litig..*, No. SA CV 12-01623 DMG, 2013 WL 5486762, at *19 (C.D. Cal. Oct. 1, 2013) (while not required, "motive to commit fraud [is] one factor that may support a strong inference of scienter.").

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 2:19-cv-05896-GW-MAA

### i. *Defendants' Motive to Raise Critical Operating Capital Supports a Strong Inference of Scienter*

The Complaint alleges that Defendants had a financial motive to commit securities fraud because the Company required investor funding for its continued operations. Courts within and without this District have found that facts like these go beyond the "generic motive" to raise capital, Def. Br. at 10, and support a strong inference of scienter. *See, e.g., Nguyen v. Radient Pharm. Corp.*, No. SACV110406DOCMLGX, 2011 WL 13141630, at *6 (C.D. Cal. Oct. 26, 2011) (that the company's CEO "was surely aware of Radient's dire financial situation and would, potentially, have motive to raise funding to allow Radient to continue operating" supported a strong inference of scienter); *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) (allegations that "defendants were motivated to inflate artificially [their company's] stock price in the short term … and obtain much-needed capital" through a secondary offering evidenced "a palpable motive for fraud" that was "stronger than the generic 'desire to raise capital' which can be attributed to every company"); *Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 853 (N.D. Tex. 2018) (that a company in "dire financial need of an infusion of capital" conducted a debt offering based on false and misleading statements supported inference of scienter).[12]

The fact that the Company made the false and misleading statements in the January 3 8-K, driving up the Company's stock price, and then immediately sold its

---

[12] Defendants' cited cases are inapposite because, unlike here, those cases did not allege a dire need for capital to support ongoing operations, or did not directly allege actual knowledge or recklessness. Def. Br. at 11. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) (alleging motive "to enhance opportunity [] to secure a line of credit from its lender"); *Anderson v. Peregrine Pharm., Inc.*, 654 F. App'x 281, 281–82 (9th Cir. 2016) (no allegations showing any defendant acted with actual knowledge or recklessness); *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012) (alleging that "Defendants were seeking a partner and were planning to raise capital in a stock offering" to support expansion efforts).

stock to raise capital from investors further supports a strong inference of scienter. *In re Synergen, Inc. Sec. Litig.*, 863 F. Supp. 1409, 1419 (D. Colo. 1994) (announcement of a new public offering, at the same time as an allegedly false statement was made, was probative of scienter).

Just three days before the issuing the false statements in the January 3 8-K, the Company had only $10,560 in cash and a working capital deficit of nearly $6 million. ¶26. The Company had effectively no sales or other means of generating revenue from operations. *Id.* The Company admitted that (1) the Company's auditors expressed doubts about the Company's ability to continue as a going concern; (2) the Company required additional capital to fund its continuing operations; (3) the Company had financed its operations entirely through equity and debt investments, and would continue to do so; (4) the Company's inability to procure adequate capital would adversely affect the Company's growth; and (5) if the Company failed to raise sufficient capital, it may need to delay, reduce, or eliminate certain key operations, including commercialization. ¶28.

After announcing the Oracle Agreement and making false statements about it in the January 3 8-K, the Company raised millions by selling its common stock at higher prices than it could have absent the misrepresentations. In the first quarter of 2018, the Company raised $2.3 million in cash from selling its stock, *over six times what the Company was able to raise in the first quarter of 2017*. ¶¶45-46. The Company raised an additional $700,000 in stock sales during the second quarter of 2018, which began on April 1, 2018 – before the first corrective disclosure on April 23, 2018. ¶48. Defendants' argument that "Plaintiffs do not really contend that Defendants committed fraud to raise capital," Def. Br. at 11, is flatly wrong. That is precisely what Plaintiffs allege: Defendants raised between $2.3 million to $3 million in direly needed capital from selling its stock to investors immediately after making

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 2:19-cv-05896-GW-MAA

false and misleading public statements – a six-fold increase year-over-year. These facts support a strong inference that Defendants acted with scienter.

These sales were *in addition to* the $1 million the Company raised during the Class Period through its Put agreement with Kodiak, bringing the total capital raised from sales of the Company's stock to $3.3 million in the first quarter alone. Exercising the Put during the Class Period allowed Defendants to raise critical capital for operations while avoiding materially greater dilution of the Company's outstanding shares. ¶57. This fact further supports an inference of scienter. *See West v. Innotrac Corp.*, No. 3:05-CV-0394-ECR-RAM, 2005 WL 8162181, at *8 (D. Nev. Dec. 27, 2005) (finding allegations of the Company's efforts to avoid dilution supported a finding of scienter); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir. 1993) (holding that desire to avoid dilutive effect of rights offering could state a claim for scienter).[13] Defendants' argument that the Put shows that the Company did not need to inflate its stock price to secure capital, Def. Br. at 11, is also misplaced. The Company raised more money from first quarter stock sales independent of the Put than it raised, or could have raised, from the entire Put, and then it raised even more capital through stock sales in the second quarter.

### ii. *Defendants' Description of the Marketo Agreement Supports a Strong Inference of Scienter*

The Complaint also alleges that Defendants' public statements concerning an agreement with Marketo, Inc. ("Marketo," and "Marketo Agreement") further

---

[13] Defendants cite to *Kane v. Madge Networks N.V.*, No. C-96-20652-RMW, 2000 WL 33208116, at *11 (N.D. Cal. May 26, 2000), *aff'd sub nom. Kane v. Zisapel*, 32 F. App'x 905 (9th Cir. 2002), to argue that the motivation to avoid dilution is insufficient, standing alone, to infer scienter. Def. Br. at 11-12. Here, however, Plaintiffs allege that the motivation to avoid dilution further buttresses Plaintiffs' additional scienter allegations, including stock sales and Defendants' actual knowledge or recklessness. *Kane* also acknowledged that avoiding dilution "is a motive for fraud." 2000 WL 33208116, at *11.

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS; 2:19-cv-05896-GW-MAA

support a strong inference of scienter. Both the Marketo Agreement and the Oracle Agreement stood to provide important distribution channels for notifiCRM. ¶72. Indeed, the Company's 2017 10-K pointed to both agreements as key distribution methods for notifiCRM, and it described the Marketo Agreement as "a similar agreement" to the Oracle Agreement. ¶74. Both the Marketo Agreement and the Oracle Agreement were met with similar enthusiasm from investors, resulting in immediate stock price increases for the Company. ¶72. In both cases, Cutaia signed the agreements before the Company announced them, but Defendants did not disclose the full text of each agreement until months later. ¶73.

Yet, despite the similarities between the two agreements, Defendants did ***not*** make the false and misleading claim that under the Marketo Agreement, Marketo would jointly develop or jointly market notifiCRM with the Company. ¶¶75-76. Clearly, Defendants knew how to accurately describe this type of agreement. This underscores that there was no misunderstanding as to the terms of the Oracle Agreement on Defendants' part, just a misrepresentation.

### iii.    *Cutaia's Lack of Stock Sales Do Not Negate an Inference of Scienter*

Finally, there is no merit to Defendants' argument that Cutaia's personal lack of stock sales and his stock "purchase" during the Class Period negate an inference of scienter. Def. Br. at 13 (noting that Cutaia "purchased" Company stock by accepting stock as payment in place of salary). First, a lack of stock sales does not negate scienter where, as here, plaintiffs have produced direct evidence of defendants' scienter. *In re Entropin, Inc. Sec. Litig.*, 487 F. Supp. 2d 1141, 1153–54 (C.D. Cal. 2007); s*ee also No. 84 Employer–Teamster Joint Council*, 320 F.3d at 944 ("the lack of stock sales by a defendant is not dispositive of scienter.").[14] Second,

---

[14] None of Defendants' cases involved allegations that Defendants had actual knowledge of the falsity of their statements, as alleged here. Def. Br. at 14 (citing *In*

courts have refused to hold that stock purchases are inconsistent with scienter where the defendants might have believed that they could have continued to hide the fraud. *See Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1202 n.2 (N.D. Cal. 2012). Notably, Cutaia's purchase of approximately 400,000 shares was inconsequential, representing less than 1% of his total holdings of approximately 57 million shares.[15]

### C. The Complaint Adequately Alleges Control Person Claims Under Section 20(a)

To state a claim under Section 20(a) of the Exchange Act, Plaintiffs must show that (1) there is a primary violation of the Exchange Act; and (2) the defendant directly or indirectly controlled the person or entity liable for the primary violation. 15 U.S.C. § 78t(a); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1037 (C.D. Cal. 2008). Defendants' only argument against Plaintiffs' Section 20(a) claim is that the Complaint does not adequately allege a primary violation of Section 10(b). Def. Br. at 14. For the reasons stated above, Plaintiffs have adequately alleged a primary violation under Section 10(b).

The Complaint also adequately alleges that Cutaia was the Company's chief executive officer at all relevant times, directly participated in the Company's management and day-to-day operations, and signed or directly made the false statements alleged herein. ¶¶17, 18, 35[16], 39, 42; *S.E.C. v. Todd*, 642 F.3d 1207, 1223

*re Aspeon, Inc. Sec. Litig.*, 168 F. App'x 836, 839–40 (9th Cir. 2006); *In re Downey Sec. Litig.*, No. CV 08-3261-JFW(RZX), 2009 WL 2767670, at *14 (C.D. Cal. Aug. 21, 2009); *Rigel*, 697 F.3d at 885; *In re K-tel Int'l, Inc. Sec. Litig.*, 107 F. Supp. 2d 994, 1005 (D. Minn. 2000), *aff'd*, 300 F.3d 881 (8th Cir. 2002)).

[15] *See* Baker Decl., Ex. B (excerpt from the Company's 2017 10-K). Again, the Court may properly take judicial notice of the Company's SEC filings, including the 2017 10-K. *Kennis*, 2016 WL 11507086, at *3.

[16] The Complaint inadvertently omitted to allege that Cutaia signed the January 3 8-K. Defendants do not challenge that fact, and the fact of Cutaia's signature is readily apparent from the face of the January 3 8-K. *See* Baker Decl., Ex. A.

- 23 -

(9th Cir. 2011) ("actual authority over the preparation and presentation to the public of financial statements is sufficient to demonstrate control."). In the Ninth Circuit, Plaintiffs "need not show that the defendant was a culpable participant in the violation." *Id.* Therefore, the Court must deny Defendants' motion to dismiss Plaintiffs' claims under Section 20(a).

## IV.   CONCLUSION

The Complaint adequately alleges facts supporting Plaintiffs' claims under Sections 10(b) and 20(a) of the Exchange Act. For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety.[17]

DATED: April 10, 2020                    **THE ROSEN LAW FIRM, P.A.**

By: <u>Laurence M. Rosen</u>
Laurence M. Rosen (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Email: lrosen@rosenlegal.com

Jacob A. Goldberg (*pro hac vice*)
Joshua Baker (*pro hac vice*)
101 Greenwood Avenue, Suite 440
Jenktintown, PA 19046
Telephone: (215) 600-2817
Email: jgoldberg@rosenlegal.com
            jbaker@rosenlegal.com

*Lead Counsel for Plaintiffs*

---

[17] If the Court grants Defendants' motion to dismiss in whole or in part, Plaintiffs respectfully request leave to amend. Defendants do not claim that granting leave to amend would cause them any undue delay or prejudice. *See Sisseton-Wahpeton Sioux Tribe of Lake Traverse Indian Reservation, N. Dakota & S. Dakota v. United States*, 90 F.3d 351, 355 (9th Cir. 1996). Here, dismissal with prejudice would be improper because it is not "clear that the complaint could not be saved by any amendment." *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

- 24 -

# CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2020, I authorized the electronic filing of the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 10, 2020                    /s/ Jacob A. Goldberg
                                         Jacob A. Goldberg

- 25 -
CERTIFICATE OF SERVICE; 2:19-cv-05896-GW-MAA